**CALIFORNIA COASTAL COMMISSION,**
**Plaintiff,**

v.

**UNITED STATES of America, Department of the Navy, Secretary of the Navy, Defendant.**

**No. 97cv2219 JM(LSP).**

United States District Court,
S.D. California.

Jan. 28, 1998.

Jamee Jordan Patterson, Deputy Attorney General, San Diego, CA, for Plaintiff.

Tom Stahl, Asst. U.S. Atty., San Diego, CA, for Defendant.

Order for a Conditional Preliminary Injunction

MILLER, District Judge.

Plaintiff California Coastal Commission seeks a preliminary injunction against defen-

dants United States of America, Department of the Navy, and Secretary of the Navy enjoining the disposal of dredged material from the San Diego Bay previously designated for coastal beach replenishment. This dredging of the bay is part of a homeporting project by which the Navy will base a Nimitz class aircraft carrier. Defendants oppose the motion for a preliminary injunction. After careful consideration of all the pleadings, parties' arguments and applicable law, the court rules as follows:

### BACKGROUND

This case deals with the fundamental federal policy of conforming a federal coastal project to meet the dictates, to "the maximum extent possible," of state coastal management plans. This federal policy is codified in federal legislation known as the Coastal Zone Management Act (CZMA) 16 U.S.C. §§ 1451, 1456(c)(1).

Plaintiff California Coastal Commission (Commission) is the state agency responsible for review of federal agency projects for consistency with the federally approved California Coastal Management Program (CMP). The Commission reviewed and approved the Homeporting project of defendants United States of America, Department of the Navy, and Secretary of the Navy (collectively, the Navy) which included the dredging of portions of the San Diego Bay and the use of dredged sandy material for beach replenishment along certain San Diego coastal communities.[1] In 1995, the Navy submitted Consistency Determination (CD) 95–95 which discussed the specifics of the dredging and disposal of the sandy material. Specifically, CD 95–95 called for the deposit of approximately 7.9 million cubic yards of material to Imperial Beach, Mission Beach, Del Mar and Oceanside to replenish areas affected by erosion. Additionally, 2 million cubic yards of other material not suitable for replenishment was to be disposed of in the ocean itself at site LA–5 approximately 4.5 miles off the coast of Point Loma. The remaining material,

unsuitable for ocean disposal, would be confined to a new wharf structure at NASNI.

On November 16, 1995 the Commission concurred with CD 95–95 and the Navy commenced its dredging project in September, 1997. Shortly thereafter, live ordnance and munitions were discovered in the dredged material deposited on the beach.

In October, 1997 the Navy requested that the Commission concur with modifications to the project which would permit the disposal of 2.5 million cubic yards of dredged material earlier designated for beach replenishment at the LA–5 site. The Navy contends it requested the modifications in order to continue dredging while a long term solution was found. According to the Navy, an interruption of the dredging would result in excessive dredging expenses and a possible delay in the Homeporting project. On October 17, 1997 the Navy submitted a new CD (CD–140–97) which proposed that all remaining sediment be dumped into the ocean at LA–5 and that some inner channel materials be used for beach replenishment. The Navy asserts that CD 140–97 called for the use of a 3 inch ordnance grate to screen out larger ordnance in the outer channel. The Navy recognized however, that it did not know the exact size of the ordnance in the outer channel and the possibility existed that some of the ordnance was too small to be sifted through the grate. Thus, the Navy could not guarantee that all ordnance would be removed through its grating system proposed in CD 140–97. According to the Commission, CD 140–97 also discussed a second alternative whereby a 3/8 inch screen on the beach would be coupled with the 3 inch screen on the dredge to eliminate the public health risks from the ordnance. CD 140–97 indicated the second alternative would be more costly and time consuming than the first.

In late October, 1997 the Navy commissioned a consulting firm to examine available sand screening technologies and prepare a

---

1. The Navy's Homeporting project was undertaken to establish a home port for a Nimitz class aircraft carrier at Naval Air Station, North Island (NASNI) by August, 1998. In order to permit the unrestricted passage of the carrier in

and out of the bay under any and all tide and load conditions, approximately 9,000,000 cubic yards of sand must be removed from the bay through dredging.

report of findings (Harris Report). A preliminary report was submitted to the Navy in November, 1997. This report however, was not provided to the Commission until December 23, 1997. According to the Commission, this draft report outlines a number of alternatives to disposing the dredged material at LA–5 which the Commission believes should be explored more fully by the parties for a possible solution to the problem posed by the ordnance.

In November, 1997 the Commission held a public hearing to discuss CD 140–97. During the hearing the Navy again modified the project to limit the disposal of materials at LA–5 to 500,000 cubic yards. The Commission objected to CD 140–97 stating that the amended project was not consistent with the requirement of the Coastal Zone Management Act (CZMA) that a project conform to a state coastal management plan to the maximum extent possible,[2] that alternatives were available which would permit the Navy to complete the dredging as originally planned, and that the Navy had failed to document the cost of alternatives.

On November 13, 1997 the Navy submitted a further modified CD (CD 161–97) for Commission concurrence. CD 161–97 proposed disposal of up to 883,000 cubic yards of material at the LA–5 site for 30 days. The Navy also updated the potential costs involved in the delay of dredging activities. Finally, the Navy proposed further negotiations with the Commission to resolve the Commission's objections to CD 140–97 and explore reasonable alternatives to the disposal at LA–5. A public hearing was scheduled for December 11, 1997 regarding CD 161–97, but the proposal was withdrawn from Commission consideration by the Navy.

On November 19, 1997 the Navy sought and received a permit modification from the U.S. Army Corps of Engineers (Corps) which authorized the Navy to dispose of the remaining materials at LA–5. This modification

was issued pursuant to § 404 of the Clean Water Act 33 U.S.C. § 1344(CWA) which gives the Corps authority to regulate the Navy's dredging and disposal operations for the project. The Corps approved this modification without Commission concurrence which the Navy contends thereby became unnecessary.

On November 19, 1997 the Navy sent a letter to the Commission indicating that the Navy intended to continue dredging and disposal of previously designated beach replenishment at the LA–5 site without the Commission's concurrence. The Navy also indicated that it planned to "fully investigate beach nourishment options for placement of sand from the Homeporting project in coordination with the California Coastal Commission."

The Commission now moves for a preliminary injunction enjoining the Navy from further dredging and disposal of beach replenishment until the alternatives outlined in the Harris Report, CD 161–97 and other reports generated by the Commission are explored. The Commission submits the Navy is in violation of the CZMA as it has not demonstrated that the disposal of all material at the LA–5 site is consistent to the maximum extent practicable with the state's CMP under the CZMA. Further the Commission argues that the Navy has never demonstrated, as required by state and federal law, that alternatives to ocean dumping or other mitigation measures are unfeasible or impracticable. The Commission believes that injunctive relief is appropriate as the public will suffer irreparable injury from the continued dredging and disposal of beach replenishment which would otherwise be irretrievably lost. The Commission submits it is likely to ultimately succeed on the merits of its claim.

The Navy opposes the motion stating that the provisions of the CMP are not applicable as the ordnance laden material is not suitable

2. The CZMA was enacted to protect the nation's coastal zones through a cooperative state and federal effort. The CZMA gives the states authority for developing CMP's such as the Navy's Homeporting project. Under its provisions, federal activities must be consistent to the maximum extent practicable with the state's coastal management program and requires that a project be fully analyzed for consistency before the project is commenced. 16 U.S.C. § 1456(c)(1)(A) California's program permits the approval of dredging projects after consideration of feasible alternatives and mitigation measures. *Id.*

for beach replenishment, that consistency with the CMP does not require the Navy to violate other applicable federal or state laws (in this case § 404 of the CWA) and that the discovery of ordnance was an unforeseeable event which, under the CZMA, allows the Navy to deviate from the CMP. Additionally, the Navy argues that a preliminary injunction would impose a great hardship on the Navy and that the Commission has failed to establish the likelihood of success or that the balance of hardships tips in its favor.

## DISCUSSION

### REQUIREMENTS UNDER THE CZMA AND CALIFORNIA COASTAL ACT

Federal agencies seeking to engage in project activity in a coastal zone must comply with the requirements of the CZMA. 16 U.S.C. § 1456(c)(1), (2). Section 307(c)(1)(A) of the CZMA states, in pertinent part:

Each federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved state management programs.

A federal agency is required to submit a "consistency determination" (as previously discussed "CD") to the state no later than 90 days before the proposed activity indicating that the federal activity would likely affect the coastal zone. 15 C.F.R. § 930.34.

The California Coastal Act (CCA) addresses the federal activity in this case. Under § 30233(a) of the CCA:

[t]he diking, filing, or dredging of open coastal waters ... shall be permitted where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects.

Section 30233(b) of the CCA further provides that:

[d]redging and spoils disposal shall be planned and carried out to avoid significant disruption to marine and wildlife habitats and water circulation. Dredge spoils suitable for beach replenishment should be transported for such purposes to appropriate beaches or into suitable longshore current systems.

▪ There is no private right of action under the CZMA itself. *City and County of San Francisco v. United States*, 443 F.Supp. 1116, 1127 (N.D.Cal.1977), *aff'd*, 615 F.2d 498 (9th Cir.1980). Judicial review of an federal agency action under the CZMA is obtained through the Administrative Procedure Act (APA). 5 U.S.C. §§ 701–706. However, in a case such as this where Congress has provided in the CZMA more than one method in achieving the Act's purpose of protecting the nation's coastal zones, the principles of equitable discretion should be applied. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 315–318, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). *Accord Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 934–935 (9th Cir.1988).

### INJUNCTIVE RELIEF

The threshold issue in the analysis of whether the Commission should be afforded equitable injunctive relief is what is the standard this court should employ for judicial review. The Navy urges this court to apply a deferential standard by which the Navy's determination to dump dredged materials previous designated for beach replenishment must be upheld unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Navy argues application of this narrow standard must result in affirmance of its action under the following rationale: The Navy, in effect, has the exclusive right to determine whether the sediments in question are "suitable for beach replenishment," the sediments as they exist in their pre-dredge state are not suitable for beach replenishment purposes, within the meaning of Cal.Pub.Res.C § 30233, because of the presence of ordnance and munitions, and, therefore, disposal of these materials into deep ocean water complies with the CZMA and CCA. The Navy then concludes that because there is sufficient evidence (existence of ordnance and munitions) to support its conclusion, this court must defer.

■] Initially, as mentioned above, the deferential standard of review should not apply in this case. The Ninth Circuit has recognized that traditional equitable discretion should be applied in determining whether the Navy has complied with the requirement of the CZMA that a homeporting project conform to the relevant state coastal management plan. *See Friends of the Earth v. U.S. Navy, supra.* 841 F.2d 927 (9th Cir.1988). The CZMA was enacted by Congress to clearly encourage the wise use of coastal resources through adoption of state coastal plans. *Friends of the Earth,* at 935. Traditional judicial review subserves that stated legislative intent.

■] Moreover, even if the Navy was correct in its urging this court to apply a deferential standard, this court must still determine whether, on this record, the Navy's action has been in accordance with the law. Even by that standard, the focus becomes whether the CZMA and the CCA have been followed, not whether, as the Navy argues, it is obligated to follow the modified § 404 permit issued by the Corps. That permit, which is not existing federal law itself, was sought and obtained by the Navy upon the very same submission which must now be scrutinized by this court.

The next question which must be addressed in this analysis is, what *precisely* is the Commission seeking by way of a preliminary injunction. After careful consideration of the pleadings and oral arguments of the Commission, it appears the Commission seeks an order preventing the Navy from offshore dumping of dredged materials, previously designated for beach replenishment, until the Commission has a reasonable opportunity to consider the feasibility of alternatives which have been previously tendered by the Navy, including those in the Harris Report commissioned by the Navy. Further, the Commission, in oral argument, suggested the feasibility of alternatives can be explored in connection with a March, 1998 Commission hearing. For the reasons set forth below, this seems to be a reasonable request by the Commission.

■ Preliminary injunctive relief is available if the party meets one of two tests: (1) a combination of probable success and the possibility of irreparable harm, or (2) the party raises serious questions and the balance of hardship tips in its favor. *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* Under both formulations, however, the party must demonstrate a "fair chance of success on the merits" and a "significant threat of irreparable injury." *Id.*

*Likelihood of success on the merits*

■ The Commission argues that the Navy cannot show, as required under the CCA, that no less environmentally damaging alternative exists or that feasible mitigation measures have been provided to minimize adverse environmental effects. Specifically, the Navy has submitted only CD 140–97 for consideration, has withdrawn CD 161–97, and has never submitted other analyses, including the Harris Report. Thus, the Navy's position that no feasible alternative exists other than to waste a valuable resource is predicated upon an incomplete factual record and unilateral determinations made by the Navy without the benefit of Commission input. On this record, the Navy has not shown that the dredging and disposal is consistent to the maximum extent practicable with the enforceable policies of approved state management programs in violation of the CZMA.

The Navy's position that it considered a reasonable range of alternatives as required under § 30233(a) of the CCA which it addressed in CD 140–97 and CD 161–97 simply does not answer the question. The Navy acknowledges in its pleadings and oral argument it "remains willing to negotiate a reasonable solution" to offshore dumping. This position presupposes there may indeed be a feasible alternative to wasting this valuable beach replenishment resource. Until pending alternatives have at least been considered by both parties, it is illogical to conclude that offshore dumping is consistent with the CCA to the maximum extent possible. Finally, this portion of the analysis does not depend on whether the discovery of ordnance was an

unforeseen event which warrants deviation from the CCA. As long as a reasonable alternative to dumping may be found with further expeditious study by the parties this factor is not material.

The Navy's contention that it has submitted feasible, less environmentally damaging alternatives and has provided certain measures to mitigate the adverse environmental effects all in compliance with the CCA and CZMA, is not borne out by the record. Specifically, the Navy's alternatives are contained in CD 161–97 and other analyses which have either been withdrawn from consideration by the Navy or never submitted in final form to the Commission. The Navy cannot meritoriously argue that these alternatives contained in the CD 161–97 or the subsequent analyses are properly before the Commission at this time and therefore in compliance with the CCA or CZMA. Therefore, as the Navy has failed to demonstrate that it has complied with the requirements of the CZMA and CCA and has failed to allege an acceptable exemption from these requirements, the court finds that on the present record the Commission would likely succeed on the merits of its case against the Navy for disposing of beach replenishment materials off the coast of California in a manner inconsistent with the federal and state law.

### Irreparable Harm and the Balancing of Hardships

Each side argues it will suffer irreparable harm if it does not prevail on the question of a preliminary injunction, and each argues the balancing of hardships tips in its favor. In this part of the analysis, the court should quickly dispose of the doomsday arguments made by both sides. The Commission argues if it does not obtain a preliminary injunction, beach replenishment materials will be forever lost resulting in beach users being swept into the sea while traversing narrow beaches. The Navy argues that a preliminary injunction may 1) imperil national security in the event the U.S.S. Stennis is delayed from its berth until high tide to maneuver, or 2) result in loss of or injury to seaman who must complete loading of the U.S.S. Stennis while underway in the open ocean during a military crisis. These considerations are far too speculative to consider. Moreover, prudent use of area beaches should not result in loss of life irrespective of beach depth, while Nimitz class carriers have negotiated safely the existing channels and berthings of San Diego Bay, and have been routinely refueled and resupplied at sea while underway.

Legitimate considerations of irreparable harm and hardship balance in favor of the Commission. One or more viable alternatives to ocean dumping of a valuable natural resource may presently exist and be quickly identified through further expeditious study and good faith negotiation by the parties. A reasonable additional period of time should be afforded for that contingency. Any offshore dumping of this resource during this period of study represents an irretrievable loss which such study and negotiation could prove to be an unnecessary and costly waste.

Any excess dredging fees to be paid by the Navy, as well as any short term delay in the completion of dredging operations for this homeporting project are more than counterbalanced by the need to allow an additional period of expedited study and negotiation by the parties during which offshore dumping operations cease. Thus, a preliminary injunction is granted enjoining the Navy from disposing at LA–5 or any other offshore dumping site dredging material previously designated for beach replenishment purposes. This preliminary injunction is conditioned upon the Commission's expeditious study of proposed alternatives to offshore dumping, including those set forth in the Harris Report, and the good faith of the parties to negotiate a resolution which is the stated goal of both sides. The court reserves jurisdiction to modify or dissolve this preliminary injunction upon shortened notice.

**IT IS SO ORDERED.**