People of the State of CALIFORNIA, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., Defendants.

Sierra Club, et al., Plaintiffs,

v.

United States Department of Transportation, et al., Defendants.

Nos. C02–4621 BZ, C02–4623 BZ.

United States District Court, N.D. California.

April 28, 2003.

Jamie B. Jefferson, California Office of Attorney General, Janill L. Richards, CA State Attorney General's Office, Oakland, CA, for People of State of California, ex rel., Bill Lockyer, Attorney General, Plaintiffs.

Gail Orendorff, U.S. Dept. of Justice, ENRD, Washington, DC, for United States Department of Transportation, Norman Y. Mineta, Secretary of Transportation, Federal Aviation Administration, Marion C. Blakey, Administrator, Federal Aviation Administration, Defendants.

## ORDER GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ZIMMERMAN, United States Magistrate Judge.

The Town of Mammoth Lakes ("Town") is located on the eastern side of Sierra Nevada in southern Mono County, an area with unique natural attractions but inconvenient access. The Mammoth Yosemite Airport, which is small and presently has no scheduled commercial service, is approximately seven miles east of the Town on U.S. 395. In the late 1990's, there were plans afoot to upgrade the area's ski facilities and to construct thousands of new housing units. At the same time, the Town was concerned that it was losing

skiing visitors to resorts with regularly scheduled commercial air service. The Town therefore proposed an expansion of the airport to accommodate commercial jet traffic, and hopefully increase substantially the number of visitors to the region. On May 30, 2000, the Mammoth Mountain Ski Area, whose majority owner is Intrawest Corporation, entered an air service agreement with American Airlines initially for commercial flights from American's hubs in Chicago and Dallas.

In October 2000, the Town published a draft environmental assessment for this expansion project. In particular, the Town proposed strengthening and extending the airport's runway, creating an air carrier apron, adding access roads and parking facilities and constructing a passenger terminal complex. The project contemplated an eventual expansion of air services with other carriers and from additional cities. The long-term result would be hundreds of thousands of air passengers every year at the Mammoth Yosemite Airport. The draft environmental assessment concluded that there would be "no significant environmental impact caused by the expansion of the airport that could not be satisfactorily mitigated." Administrative Record ("AR") 88 at 1. A number of state and federal agencies, along with environmental organizations and individuals, submitted comments contesting that conclusion.

In December of 2000, the Town submitted a final environmental assessment ("FEA") which was little changed from the draft. The Federal Aviation Administration then adopted the FEA and signed a Finding of No Significant Impact ("FON-SI") for the project. Some of the concerned agencies, including plaintiff the State of California, continued to express their concerns about the project. In March 2001, the Town addressed a few of those concerns,[1] in a document, which though titled, "Errata," supplements, rather than corrects, the FEA. Also in March 2001, Jones & Stokes, a firm retained by the consulting airport engineer, prepared a Biological Assessment to assist Mammoth Yosemite Airport with biological resource issues related to the airport expansion project. AR 241 Ex. A. Based on information in the Biological Assessment, the United States Fish and Wildlife Service ("FWS") prepared a Biological Opinion in July 2001. On July 29, 2002, the Federal Aviation Administration ("FAA") issued a Record of Decision ("ROD") unconditionally approving the airport project and the FONSI.

Thereafter, the People of the State of California and the Sierra Club and other conservationist organizations (collectively "plaintiffs") filed separate actions against federal defendants the United States Department of Transportation, Secretary of Transportation Norman Mineta, the Federal Aviation Administration and Federal Aviation Administrator Marion Blakey (collectively "defendants"), alleging that defendants had violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d, by approving the FEA and issuing the FONSI for the airport expansion project at the Mammoth Yosemite Airport.[2] Plaintiffs seek orders enjoining the expansion project and requiring defendants to prepare an Environmental Impact

---

**1.** The principal concerns addressed are the likelihood of birds being struck by aircraft and the impact of the project on the sage grouse.

**2.** On November 26, 2002, the separate actions by the State and the Sierra Club were related.

On February 3, 2003, I permitted the Town to intervene as a defendant only in the remedy phase of this case. On March 31, 2003, I granted the Town's motion for leave to file an amicus curiae brief on the merits addressing the merits of this case.

Statement ("EIS") in compliance with NEPA.

Pursuant to stipulation, the parties filed cross-motions for summary judgment and I held a hearing .on April 16, 2003. For the reasons stated below, I find that under the circumstances of this case, defendants' decision not to prepare an EIS was unreasonable.[3]

■ NEPA requires federal agencies to prepare an EIS prior to taking "major Federal actions significantly affecting the quality" of the "environment." *Kern v. United States Bureau of Land Management*, 284 F.3d 1062, 1067 (9th Cir.2002) (quoting 42 U.S.C. § 4332(2)(C)). An agency may prepare an EA, which briefly describes the need for, alternatives to, and environmental impacts of the proposed federal action, to decide whether the impacts of the proposed action are significant enough to warrant an EIS. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.1998) (citing 40 C.F.R. § 1508.9). If an agency determines in the EA that the federal action will not significantly affect the environment, the agency must issue a FONSI and its NEPA review ends. *See Blue Mountains*, 161 F.3d at 1212; 40 C.F.R. § 1508.13.

■ In reviewing an agency's decision not to prepare an EIS, the inquiry is whether the "'responsible · agency has "reasonably concluded" that the project will have no significant adverse environmental consequences.'" *Save the Yaak Committee v. J.R. Block*, 840 F.2d 714, 717 (9th Cir.1988) (quoting *San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980)). "If substantial questions are raised regarding whether the proposed ac-

tion may have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." *Id.* (emphasis in original). An agency's decision not to prepare an EIS is unreasonable if the agency fails to "'supply a convincing statement of reasons why potential impacts are insignificant'" because "'[t]he statement of reasons is crucial' in determining whether the agency took a 'hard look' at the potential environmental impact of a project" as required by NEPA. *Id.* (quoting *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir.1985)).

■ Whether a project may cause a significant effect on the environment requires consideration of context and intensity. *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir.2001); 40 C.F.R. § 1508.27. Context simply "delimits the scope of the agency's action, including the interests affected." *National Parks*, 241 F.3d at 731; *see also* 40 C.F.R. § 1508.27(a). Intensity relates to the "degree to which the agency action affects the locale and interests identified in the context part of the inquiry," and includes consideration of factors such as the controversial nature of the project, the cumulative impacts of the project and the degree to which the project may impact endangered or threatened species. *Id.; see also* 40 C.F.R. § 1508.27(b).

### Controversy

A review of the FEA begins with the nature of the opposition. It comes not just from concerned citizens or environmental organizations such as plaintiffs Sierra Club, National Parks Conservation Association, California Trout, Inc. and

---

**3.** Defendants argue that because plaintiffs have sought review of an order under Part A within the meaning of 49 U.S.C. § 46110(a), the Court of Appeals has exclusive jurisdiction in this case. As I am bound by Ninth Circuit precedent finding that review in this Court is appropriate under these circumstances, I express no opinion on this jurisdictional issue. *City of Alameda v. Federal Aviation Administration*, 285 F.3d 1143 (9th Cir.2002).

Natural Resources Defense Council; it comes from many of the state and federal agencies charged with environmental or conservation responsibilities in the region. In fact, the plaintiff in the lead suit is the State of California. Little would be gained by chronicling the FEA's failure to adequately address each of the issues raised by the various state and federal agencies.[4] One example will suffice. In response to the draft environmental assessment, on November 14, 2000, the California Department of Fish and Game ("DFG") submitted a lengthy and detailed letter concluding that "the information contained in the FEA is inadequate to support a finding of no significant impact." AR 127 Appx J at S–D. On December 15, 2000, a DFG representative called the FAA to request more information and time to prepare a final response to the FEA. AR 118. FWS was also reviewing the FEA at that time and had decided to request that the FAA prepare an EIS. AR 119. Notwithstanding defendants' knowledge about the concerns these agencies were raising, on that same day, the FONSI was recommended for approval. AR 125.

▮ The FONSI states that the FEA was "coordinated with" these concerned governmental agencies. The record, however, demonstrates that the FEA ignored or did not adequately treat their concerns.[5] In doing so, the FEA failed to evaluate "the degree to which the effects on the quality of the human environment are likely to be controversial." 40 C.F.R. § 1508.27(b)(4). In this context, the term "controversial" refers to "cases where a substantial dispute exists as to the size, nature, or effect of the major Federal action rather than to the existence of opposition to a use." *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1193 (9th Cir.1988) (finding that where Sierra Club presented evidence from numerous experts showing the EA's inadequacies and casting doubt on the agency's conclusions, "[t]his is precisely the type of 'controversial' action for which an EIS must be prepared."). Concerns about a project's substantial impacts raised by agencies with special expertise weigh in favor of requiring an EIS. *See Foundation for No. Am. Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1178–79 (9th Cir.1982). Opposition to a project does not necessarily create a controversy requiring an EIS, (*see Surfrider Foundation v. Dalton,* 989 F.Supp. 1309, 1323 (S.D.Cal. 1998)), but the volume of comments from and the serious concerns raised by federal and state agencies specifically charged with protecting the environment support a

**4.** The record in this case contains comments from various state and federal agencies that question the conclusion that the airport project would have no significant environmental impact. *See generally,* AR 127 at Appx. J at F–B (Bureau of Land Management); F–C (National Park Service); S–B (California Department of Transportation); S–C (California Regional Water Quality Control Board); S–D (California Department of Fish and Game); L–A (Long Valley Fire Protection District).

**5.** After the Errata, the Biological Assessment and the Biological Opinion, some agencies assented to the project. *See* AR 241 Ex. B, Appx C at 2. This does not alter the fact that substantial questions were raised at the time the FEA and FONSI were prepared that should have triggered preparation of an EIS. *See* 40 C.F.R. § 1508.9(a)(1); *Blue Mountains,* 161 F.3d at 1214. In addition to reviewing the FEA, I have reviewed all subsequent environmental analyses, including the Errata, the Biological Assessment and the Biological Opinion. Even if it is proper to consider all subsequent documents as part of the FEA, the environmental analysis is still lacking because aspects of the environmental impacts due to an increase in visitors, such as those described in this opinion, were not appropriately evaluated in any document. Moreover, as far as I can tell, analyses subsequent to the FEA were not subject to public comment.

finding that an EIS was required in this case. Given the controversy surrounding the airport project, defendants unreasonably failed to prepare an EIS.

### Growth/Cumulative Impacts

■ Plaintiffs next contend that the FEA fails to adequately analyze the growth-inducing effects of the airport project. Plaintiffs also contend that the FEA fails to adequately analyze the cumulative impacts of the airport project. A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions...."[6] 40 C.F.R. § 1508.7; *Blue Mountains*, 161 F.3d at 1214. Because in this case these contentions are frequently related, I will largely consider them together.

Defendants claim that the purpose of the airport project to extend the runway is to "provide the necessary runway length to safely allow air carrier/charter aircraft up to the size of a Boeing 757–200 to operate at the Airport." AR 127 at I–1. Seen that way, there are "no significant environmental impacts caused by the expansion of the Airport that could not be satisfactorily mitigated." AR 127 at I; AR 125.

Defendants reached this conclusion by not taking any look, and certainly not a hard look, at many environmental consequences of the airport project. At bottom, many deficiencies in the FEA can be attributed to defendants' myopic view of the airport project. If the only purpose of airport expansion was to improve the safety and convenience of existing air service, the FEA might be sufficient to comply

with NEPA.[7] Section 2.3 of the FEA states, however, that the need for an improved airport is to stimulate regional growth by improving access to the region's "year-round recreational attractions consisting of skiing in the winter and numerous outdoor recreational activities in the spring, summer and autumn, which include major attractions such as Yosemite National Park, Mono Lake, June Lake and Devil's Postpile National Monument." AR 127 at II–2. The FEA goes on to note that the Mammoth Lakes region has lost ski visitors to other resorts which have direct commercial air service and that one way of attracting "new visitors to the region would be by reducing visitor travel times to the Mammoth Lakes area. The development of airport facilities to accommodate commercial airline and charter operations would allow direct access to the region, thereby reducing visitor travel time." AR 127 at II–2. Yet the FEA focuses almost exclusively on the impact that the airport expansion project itself and those few projects directly tied to it will cause. Almost entirely ignored in the FEA is a consideration of the impact on the region from the thousands or hundreds of thousands of additional visitors that the airport expansion is expected to attract. Also missing from the FEA is a consideration of the cumulative impacts on the region of other projects near the airport and other reasonably foreseeable projects. A few examples follow:

1. **Other Projects.** Although the FEA shows eight projects in the region near the airport, (*see* AR 127 at Exhibit V–22), defendants unreasonably limit the cumulative impacts discussion to two projects that are

---

**6.** Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. In determining whether a project will have a significant impact, an agency must consider "whether the action is related to other actions with individually in-

significant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7).

**7.** Even then, defendant's treatment of some of the wildlife issues such as the bighorn sheep might be challengeable.

in the vicinity of the airport, one within the airport boundary and one near the airport along U.S. 395. Not only is the discussion of cumulative environmental impacts of these projects inadequate, (see, e.g., AR 127 at V–87) (discussion of biotic communities limited to the mule deer, when other wildlife are present), defendants' failure to meaningfully analyze any of the other currently proposed projects near the airport is unreasonable. Moreover, additional hotel and other construction will be necessary to accommodate the increase in visitors, yet the FEA does not address the cumulative impacts of these foreseeable future projects.

2. **Residential and Lodging Growth.** The FEA estimates that the number of skier days will double in the next twenty years. With little basis in the record, the FEA concludes that existing under-utilized residential properties will be able to sustain this increase. The FEA does recognize that the number of hotel and motel units will double. AR 127 at V–25. A substantial increase in visitors and a doubling in hotel and motel capacity should of necessity result in an increase in the region's permanent and temporary population to service these visitors. No where does the FEA consider the impact that this doubling in hotel and motels, and this resulting increase in population, will have on the region's air and water quality, sewage treatment facilities, traffic and the like.

In oral argument, the FAA focused on the fact that the Town has projected growth in the region to expand significantly in the next twenty years with or without the airport expansion. While this may be true, there is no discussion in the FEA about the fact that introducing commercial air service will accelerate that growth. As the Town acknowledged in the Draft EA:

the introduction of air carrier jet service to Mammoth Yosemite Airport is likely to result in faster tourism growth to the region than would otherwise occur .... The convenience of jet service to Mammoth Yosemite Airport would undoubtedly cause the growth to occur faster than if the air service were not provided.

AR 88 at V–77. This section was not included in the FEA and accelerated growth is not analyzed in the FEA. This indicates that the FEA did not take a hard look at the environmental impacts of rapid growth.

3. **Air Quality.** Defendants' conclusions about the airport project's impact on air quality are not supported by evidence in the record and are therefore unreasonable and show that defendants failed to take a hard look at the air quality issues raised by the airport project. For example, the FEA states that the "introduction of air service will directly reduce adverse air quality emissions as a result of reduced vehicular traffic in the region." AR 127 at II–2. This statement seems at most disingenuous or at least wishful thinking. With respect to existing visitors, the FEA states that California residents account for 87% of Mammoth Lakes' current business and that 70% of California users are from the Los Angeles area. AR 127 at IV–12. The FEA concedes that the "vast majority" of the Los Angeles visitors will continue to drive to Mammoth Lakes. AR 127 at IV–14. If the large majority of current visitors will continue to drive and the airport project will bring in hundreds of thousands of additional visitors, I find it implausible that vehicular emissions will decrease as a result of the airport expansion. Even if some of the new visitors fly rather than drive, many people would rent cars once they arrived.[8] Defendants assert that

---

8. Moreover, flights from American Airlines' hubs in Chicago and Dallas, not to mention

the other hubs expected to follow, would open

more visitors will take public transportation and even estimate the number of indirect vehicle trips to be zero under the proposed action. Not only do they fail to cite any factual basis for these conclusions, the basic premise under which defendants calculate the indirect vehicle trips is implausible. Defendants assume that "all passenger vehicles originating at the airport would travel a roundtrip distance of approximately 19 miles (i.e., to and from the Town of Mammoth Lakes)." AR 127 at V–33. With all the natural attractions in and around Mammoth Lakes, it is illogical to assume that all passenger vehicles will travel solely from the airport to a hotel and remain there for the remainder of the trip before returning to the airport.

4. **Traffic.** The FEA's traffic study suffers from the same tunnel vision. The FEA focuses on delays likely to be experienced at the intersection of U.S. 395 and Hot Creek Road and recommends mitigation measures. AR 127 at V–26–27. In a brief, two-paragraph discussion, the FEA recognizes the increase in traffic resulting from the increased number of visitors, but concludes that the increased traffic "would be offset on a micro scale by fewer tourists driving automobiles from farther airports of their homes .... Bus service between the Town and the Airport is anticipated to be the primary mode of ground transportation for passengers." AR 127 at V–27. There is no citation to any study or analysis to support these conclusions. Without any support in the FEA for these sweeping statements, I cannot find that defendants took a hard look at the environmental impacts resulting from increased traffic.

5. **Water Quality.** The FEA states that "the entire basin in which Mammoth Yosemite Airport is located has been designated as an area in which septic tank and leaching fields cannot be used except with special approval of the [Regional Water Quality Control Board]." AR 127 at V–49. While the FEA concludes that there is adequate water supply for the project and that increased water usage would create no significant environmental impacts, the analysis is entirely focused on adequate water and sewage for the airport and its environs. There is no consideration about providing water or sewage for the growth and increased tourism mentioned elsewhere in the FEA.

6. **The Non-skiing Season.** The bulk of the FEA addresses the impact of the airport expansion on the Mammoth Lakes region during the winter. The current air service contract between the Mammoth Mountain Ski Area and American Airlines is limited to service during the ski season. However, the FEA notes that the region's appeal is year-round and air service expansion to include year-round service is contemplated. Yet, there is no or virtually no consideration given to the impact that the thousands of additional visitors will have on Yosemite National Park, Devils Postpile National Monument, Mono Lake and the many other wilderness and recreational areas in the region.

Little would be gained by cataloguing the many other impacts, such as energy and natural resources, noise pollution, waste disposal and fire protection, which are given the same myopic treatment in the FEA. Suffice it to say that defendants' argument that the airport project is growth-accommodating rather than

the region up to additional domestic and international visitors. While the FEA states that "many of the visitors traveling from these locations [throughout the United States and internationally] to or from the Mammoth

Lakes area currently use Los Angeles or Reno airports and drive between the Mammoth Lakes area and these airports," (AR 127 at IV–7), there is no support for this statement in the record.

growth-inducing, (*see* Fed. Defs.' Opp'n to Pls.' Mots. for Summ. J. at 24:2), is belied by the record.

In keeping with the avowed purpose of the project, at the hearing, defendants described the FAA's mission, which is to "ensure the safe and efficient use of navigable airspace," (AR 241 at 6), as the lens through which the environmental impacts of the airport project was viewed. The FAA distanced itself from the Town's goal of expanding the airport to attract more visitors to the area.[9] While the FAA may have no real stake in increasing visitors to Mammoth Mountain, it is charged by NEPA with examining the indirect effects of airport projects. 40 C.F.R. § 1508(b) (NEPA requires consideration of indirect effects which are "caused by the action and are later in time or farther removed in distance, but are still reasonable foreseeable."). The FAA conceded at the hearing that it has a duty to address indirect environmental impacts, but quarreled with the notion that it was required to take a hard look at the indirect impacts from the increase in visitors, which the FAA contends would not be caused by the FAA or the airport project. Given the context of this project, however, this position is unreasonable. While, in the Town's words, Mammoth Lakes is not a sleepy town with a dirt runway and a wind sock, it is also not a large city with substantial established commercial air service such as Seattle or Los Angeles. In cases involving airports in those cities, challenges to the FAA's review of environmental impacts were rejected, primarily due to existing circumstances in those airports. *City of Los Angeles v. Federal Aviation Administration*, 138 F.3d 806 (9th Cir.1998) (rejecting a challenge to the environmental impact statement (not an environmental assessment) for a terminal expansion project at the Burbank–Glendale–Pasadena Airport based on a claim that the FAA failed to take a hard look at the increase in passengers due to the new terminal); *Seattle Community Council Federation v. Federal Aviation Administration*, 961 F.2d 829 (9th Cir.1992) (rejecting the challenge to the FAA's analysis of the effects of increased numbers of flights because the project to change flight patterns of some aircraft at the Seattle airport was simply to accommodate existing air traffic).

In a case involving a highway interchange in an agricultural area between Dixon and Davis, California, which is more analogous to the Mammoth Lakes area, the Ninth Circuit recognized that "it is obvious that constructing a large interchange on a major interstate highway in an agricultural area where no connecting road currently exists will have a substantial impact on a number of environmental factors." *City of Davis v. Coleman*, 521 F.2d 661, 674–75 (9th Cir.1975). Given the nature of the area, the Ninth Circuit concluded that it was unreasonable for the agency to decide, without further consideration of the environmental impacts of increased population, increased traffic, increased pollution and increased demand for services, that the environmental impact of the highway interchange would be insignificant. *Id.* at 675. This reasoning applies with equal force in this case involving expansion of an airport to accommodate regular commercial air service, where none currently exists, in a scenic, mountain region with unique, largely undeveloped natural resources. Cases cited by the FAA for the proposition that it need not address indirect growth impacts on the environment are inapposite. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190

9. In preparing the ROD, the FAA was mindful of its duty to determine whether "the impacts from the Expansion Project will significantly impact the quality of the surrounding human environment." AR 241 at 15.

(D.C.Cir.1991); *City of Grapevine, Texas v. Department of Transportation,* 17 F.3d 1502 (D.C.Cir.1994).

As in *City of Davis,* the growth-inducing effects of the airport project appear to be its "raison d'etre." It was hardly reasonable for defendants to conclude, based on the FEA, that the environmental impact of the proposed airport expansion would be insignificant. Common sense dictates that improving an airport to introduce regular commercial air service in an area known for, and reliant on, tourism, will have a substantial impact on a number of environmental factors. The FEA failed to take a hard look at them.

### Wildlife

The FEA's conclusion that the project would have no significant impact on endangered or threatened species strains credulity. *See* AR 127 at V–65. Among other flaws, the FEA fails to analyze impacts to the Owens tui chub and the Sierra Nevada bighorn sheep, both of which are located in the vicinity of the airport. AR 241 Ex. A at 1–1. The effects on the chub are analyzed in subsequent documents, such as the Biological Assessment and the Biological Opinion. It is unclear whether those documents are considered as part of the FEA in determining whether the FEA was adequate, in part because those documents do not appear to have been exposed to public comment. The impacts to the bighorn sheep were only cursorily analyzed by Jones & Stokes, who determined that the sheep were "unlikely" to be adversely effected. AR 241 Appx A at 5–4, 5–5. Defendants point to no detailed analysis of the sheep by the appropriate federal or state agency. The ROD does not even mention bighorn sheep, even though the likelihood of impacts on the sheep, as described by Jones & Stokes, was ambiguous.

I have concluded that I need not resolve the issues presented by defendants' piecemeal analysis of the wildlife issues. Since defendants will have to prepare an environmental impact statement, they will have the opportunity to analyze the wildlife issues in a more systematic fashion and expose this analysis to public comment.

The issue before the court is not whether the airport expansion project is good for the Town or the region, but whether defendants took a hard look at the environmental consequences of the airport project and the decision to forego an EIS was reasonable. Plaintiffs have shown that the airport expansion project may have serious environmental consequences to the Mammoth Lakes region. Because dependants failed to take a hard look at those consequences, defendants must prepare an environmental impact statement in compliance with NEPA.[10]

It is therefore **ORDERED** that plaintiffs' motions for summary judgment are **GRANTED** and defendants' motion is **DENIED.** It is further **ORDERED** that defendants, including the Town of Mammoth Lakes, which intervened on the remedy portion of this matter, are hereby **ENJOINED** from commencing any construction or other work on the airport expansion project pending conformance with all NEPA requirements, including completion and adoption of an Environmental Impact Statement.[11] The Town's request to ex-

---

10. In view of this result, I need not reach other issues raised by the motions, such as the whether defendants adequately considered alternative sites.

11. *See Blue Mountains,* 161 F.3d at 1212 (EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor.") (quoting *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998)); *National Parks & Conservation Association v. Babbitt,* 241 F.3d 722, 731 (9th Cir.2001)

clude from this injunction certain construction activities is **DENIED.**[12] The Court retains jurisdiction to enforce or modify this injunction.

---

**12.** The reasons for this denial will be stated in a separate order.