Filed 5/22/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SLPR, L.L.C., et al., <br><br>    Plaintiffs and Appellants, <br><br>    v. <br><br>SAN DIEGO UNIFIED PORT DISTRICT et al, <br><br>    Defendants and Respondents. | D074958 <br><br><br> (Super. Ct. No. GIC860766-1, consolidated with Nos. 37-2008-00079175-CU-OR-CTL and 37-2016-00025353-CU-EI-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge. (Retired judge of the San Diego Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.


Thornes Bartolotta McGuirre; Vincent J. Bartolotta, Jr. and Karen R. Frostrom; Beus Gilbert; Thomas A. Gilson and Megan Beus, for Plaintiffs and Appellants.

Thomas A. Russell, General Counsel, Ellen F. Gross, Assistant General Counsel, John Carter, Deputy General Counsel; and Scott Noya for Defendant and Respondent San Diego Unified Port District.

Xavier Becerra, Attorney General, Daniel A. Olivas, Assistant Attorney General, Jamee Jordan Patterson and Hayley Peterson, Deputy Attorneys General, for Defendant and Respondent State of California.

Plaintiffs SLPR, L.L.C. (SLPR), Ann Goodfellow, trustee of the survivor's trust of the Goodfellow Family Trust (Goodfellow), and Jerry M. Cannon and Michael S. Morris, trustees of the Sewall Family Trust (Sewall) (together Plaintiffs) appeal a judgment entered in favor of defendant State of California (State) in their action against State and the San Diego Unified Port District (Port) (together Defendants) arising out of damage to their bayside properties in the City of Coronado (City) allegedly caused by dredging of the San Diego Bay (Bay).  As discussed in our initial opinion in this case, *SLPR, LLC et al. v. State Lands Com. et al.* (Nov. 29, 2012, D059913) [nonpub. opn.] (*SLPR I*), the United States Navy (Navy) dredged an area of the Bay within the Naval Air Station North Island Turning Basin (Turning Basin) in 1998 and 2002 and the United States Army Corps of Engineers (Army) dredged the central navigation channel (Channel) of the Bay from 2004 to 2005.  (*SLPR I*, at pp. 3-5.)  In *SLPR I*, we concluded, inter alia, that the trial court erred by granting summary adjudication on Plaintiffs' cause of action for quiet title because there were triable issues of material fact on the meaning of a facially ambiguous 1931 judgment (Spreckels judgment) in favor of City and against J.D. and A.B. Spreckels Investment Company (Spreckels), owner of real property along the Bay's shoreline and Plaintiffs' predecessor-in-interest, and other defendants regarding whether that judgment fixed the bayside boundaries of Plaintiffs' properties or whether it located only the current position of the mean high tide line (MHTL) at that time and

2

retained the ambulatory MHTL as the legal boundaries of their properties. (*SLPR I*, at pp. 11, 22-23, 30-31.)

On remand after *SLPR I*, Plaintiffs filed a third amended complaint (TAC), alleging causes of action for quiet title, inverse condemnation related to the quiet title cause of action (by SLPR and Arendsee), inverse condemnation (by Plaintiffs), nuisance, and removal of lateral support. The trial court sustained State's demurrer to the third, fourth, and fifth causes of action. The court subsequently conducted a bench trial on the first and second causes of action and, after admitting and considering extrinsic evidence regarding the meaning of the Spreckels judgment, found that the judgment had fixed the boundaries between Plaintiffs' properties and the public tidelands. The court then entered judgment in favor of State and against Plaintiffs.

On appeal, Plaintiffs contend the trial court erred by: (1) concluding State's affirmative defense of res judicata based on the Spreckels judgment applied to bar the first and second causes of action; and (2) sustaining State's demurrer to the third, fourth, and fifth causes of action. Based on our reasoning *post*, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]

In 1923, the Legislature granted to City, in public trust, the tidelands and submerged lands, whether filled or unfilled, between the MHTL and pierhead line from Glorietta Bay to the Spanish Bight, which includes the area adjacent to Plaintiffs' properties. In 1930, City filed an action to quiet title against Spreckels and other

_____

[1]     For additional factual and procedural background, refer to our opinion in *SLPR I*.

3

defendants to determine the location of the MHTL boundary between private uplands and City's public tidelands. (*SLPR I*, *supra*, at p. 2.) In 1931, as discussed *post*, City and Spreckels approved a settlement agreement and changed their pleadings to reflect their stipulated courses and distances boundary description. The following day, the trial court entered the Spreckels judgment, ostensibly determining the location of that boundary. The Spreckels judgment, titled "JUDGMENT QUIETING TITLE," states in pertinent part:

> "The above entitled cause came on regularly for trial . . . upon the amended complaint of [City] and the respective answers thereto of the defendants [Spreckels and other named defendants]. . . . And the Court having heard the testimony and the statements of counsel for the parties and being of opinion and finding that at all times prior to the date of this judgment the location of the [MHTL] of [Bay] on the [City] side of [Bay], was uncertain and unknown to the parties to this action, and being now sufficiently advised and informed in the premises for the purposes hereof, it is now hereby ORDERED, ADJUDGED, AND DECREED by the Court as follows:

> "First: At the time of the commencement of the above entitled action the [City] was, it ever since has been, and it now is the owner, as Trustee for and on behalf of [City] and the inhabitants thereof, of the following described property situated in [Bay], which is more particularly described as follows: All the tidelands and submerged lands, whether filled or unfilled, within the boundaries of [City] as the said boundaries exist at the date of this judgment, and situated upon the [City] side of [Bay], and lying between the line of mean high tide and the pierhead line in [Bay], as the said pierhead line has been or may hereafter be established by the Federal Government, and between the prolongation of the easterly boundary of [City] into Glorietta Bay (a portion of [Bay]) and the prolongation of the westerly boundary line of [City] into Spanish Bight (a portion of [Bay]).

> "Second: The said [MHTL] above mentioned, and which constitutes the boundary line between the upland and the aforesaid tidelands and submerged lands constituting a part of [Bay] adjoining and bordering

4

upon the said uplands, is located and situated at, along and upon a line described as follows, to-wit:

"Beginning at Station 0, said Station being a point on the [MHTL] of [Bay] at its intersection with the Easterly city limits line of [City], said point being marked by an 8" x 8" concrete monument marked CCXII [and then setting forth a lengthy surveyor's description of angles and distances representing about 110 lines that run from numbered "station" to numbered "station" beginning with "Station 0" and terminating at "Station 110"], . . . [¶] . . . Station No. 110 being a point on the [MHTL] of Spanish Bight a portion of [Bay], at the intersection of said [MHTL] with the Westerly Boundary of [City].

"Third: At the time of the commencement of the above entitled action [Spreckels] was, continuously since February 5, 1921, had been, and it now is the owner of and in the possession and enjoyment of an estate and interest in real property, to-wit: an estate for years in and to all and singular the lands and premises, whether tidelands or submerged lands and whether filled or unfilled, situate in Glorietta Bay in [Bay] and lying below the [MHTL] of [Bay] in the said Glorietta Bay and between [two points identified by marked concrete monuments] and containing not more than forty (40) acres of the said tidelands and/or submerged lands; that the aforesaid estate of [Spreckels] in and to the lands and premises aforesaid is based upon and exists by virtue of and is for the term and terms, period and periods, and pursuant to the covenants, conditions, and agreement of lease thereof, from the Board of Harbor Commissioners for [Bay] to [Spreckels], dated February 5, 1921; that the said lease is in words and figures as follows, to-wit: [¶] [quoting the 1921 lease between Spreckels and the Board of State Harbor Commissioners for Bay]. . . ."

City subsequently recorded a Miscellaneous Map No. 121 (Map 121), depicting the boundary location determined by the Spreckels judgment.

In 1995, Navy submitted a consistency determination to the California Coastal Commission (CCC) regarding its plan to dredge the Turning Basin to allow additional aircraft carriers to be homeported at Naval Air Station North Island (NASNI). CCC concurred with Navy's determination that the proposed dredging project was consistent

5

with the California Coastal Management Program.  (*California Coastal Com. v. U. S.* (S.D. Cal. 1998) 5 F.Supp.2d 1106, 1108 (*California Coastal Com.*).)  In 1997, Navy began dredging the Turning Basin, but then discovered live ordnance and submitted a new consistency determination that would allow it to dispose of dredged material offshore instead of on public beaches for sand replenishment as originally proposed. (*Ibid.*)  CCC objected to the new consistency determination, arguing that the modified dredging project did not conform to the California Coastal Management Program to the maximum extent possible and that alternatives were available which would allow Navy to complete the project as originally proposed.  (*Id.* at p. 1109.)  After Navy informed CCC that it intended to proceed without CCC's concurrence with the new consistency determination, CCC filed a federal district court action seeking a preliminary injunction enjoining Navy from proceeding with its modified dredging plan.  (*Id.* at pp. 1107, 1109.) The district court issued a preliminary injunction enjoining Navy from disposing all dredged material offshore.  (*Id.* at p. 1110.)  Navy ultimately completed its dredging project in 1998.  In 2002, Navy completed additional dredging of the Turning Basin, presumably after issuing a consistency determination with which CCC concurred.

In 2005, Army completed its dredging of the Channel, presumably after CCC concurred with, or did not object to, Army's consistency determination in which it agreed to dispose of dredged materials off the shore of Imperial Beach.

In 2006, SLPR filed a complaint against Port in the San Diego County Superior Court (case No. GIC860766-1), alleging causes of action for inverse condemnation and removal of lateral support.  (*SLPR I*, *supra*, at p. 5.)  After SLPR filed a first amended

6

complaint adding Army as a defendant, Army removed the action to federal court. (*Ibid.*) In federal court, a second amended complaint was filed, adding Sewall, Goodfellow, and others as plaintiffs and alleging causes of action for nuisance, inverse condemnation, and removal of lateral support against only Port and Administrative Procedure Act causes of action against Army and/or Navy. (*Ibid.*)

In 2008, Plaintiffs filed a separate complaint in the San Diego County Superior Court (case No. 37-2008-00079175-CU-OR-CTL), alleging a quiet title cause of action against Port and State and alleging causes of action against State for nuisance, inverse condemnation, and removal of lateral support. (*SLPR I*, *supra*, at p. 5.) In 2009, the federal court remanded to the state court Plaintiffs' causes of action against Port. (*Ibid.*) Also in 2009, the federal court ordered Army to submit a supplemental consistency determination to CCC regarding its Channel dredging project. After Army issued a supplemental consistency determination, Plaintiffs submitted to CCC their objections to it. CCC concurred with Army's supplemental consistency determination.

In 2010, State and Port filed motions for summary judgment. (*SLPR I*, *supra*, at p. 6.) Plaintiffs filed a motion for summary adjudication of their causes of action for quiet title and removal of lateral support. (*Ibid.*) The trial court granted Defendants' motions for summary judgment and thereafter entered judgment for Defendants. (*Id.* at p. 7.)

On appeal from that judgment, in *SLPR I*, we reversed the judgment. (*SLPR I*, *supra*, at p. 73.) On Plaintiffs' quiet title cause of action, we concluded that the Spreckels judgment is not unambiguous on its face and, without resort to extrinsic evidence, is

7

reasonably susceptible to two meanings. (*Id*. at p. 22.) We stated: "First, the [Spreckels] judgment could reasonably be construed as *fixing* the boundary between City's tidelands and contiguous private lands (owned by Spreckels at that time). Second, in contrast, the judgment could reasonably be construed as merely *locating* the position of the current MHTL at that time while retaining the *MHTL* as the legal boundary between City's tidelands and contiguous private lands." (*Id*. at pp. 22-23.) Therefore, we concluded there were triable issues of material fact on the quiet title cause of action that precluded summary judgment. (*Id*. at pp. 22, 30-31.) We likewise concluded there were triable issues of material fact on Plaintiffs' causes of action for inverse condemnation, nuisance, and removal of lateral support. (*Id*. at pp. 47-48, 54, 65-66.) In particular, on the inverse condemnation cause of action, we concluded: "[A] reasonable trier of fact could find the State: (1) actively participated in the projects when it [i.e., CCC] concurred with the federal government's consistency determinations; (2) actively participated in the projects when it demanded and obtained changes to the projects (i.e., by requiring the dredged materials to be deposited along Imperial Beach); and (3) had the power to require changes to the projects but failed to do so (i.e., failed to require erosion mitigation measures)." (*Id*. at pp. 51-52.)

On remand, Plaintiffs filed the operative TAC, alleging causes of action for quiet title, inverse condemnation related to the quiet title cause of action (by SLPR and Arendsee), inverse condemnation (by Plaintiffs), nuisance, and removal of lateral support. In particular, the TAC alleged State substantially participated in all three

8

dredging projects based on CCC's authority to issue or withhold concurrences with the Navy and Army's consistency determinations for the dredging projects.

State demurred to the TAC. Regarding the third, fourth, and fifth causes of action, State asserted the affirmative defense that Plaintiffs had failed to timely challenge CCC's concurrences with the Navy and Army's consistency determinations by filing a petition for writ of administrative mandate within 60 days after CCC's decisions became final as required by Public Resources Code section 30801. Finding that the 60-day statute of limitations barred Plaintiffs' claims against State based on CCC's concurrences or other decisions regarding the Navy and Army's consistency determinations, the trial court sustained State's demurrer to the third, fourth, and fifth causes of action. The court overruled State's demurrer to the first and second causes of action, finding the TAC stated sufficient facts to constitute those claims against State. Accordingly, the court dismissed the third, fourth, and fifth causes of action against State.

The court subsequently conducted a bench trial on the first and second causes of action and, after admitting and considering extrinsic evidence regarding the meaning of the Spreckels judgment, found that the Spreckels judgment had *fixed* the boundaries between Plaintiffs' properties and the public tidelands. Extensively discussing the extrinsic evidence, the court found that evidence clarified any facial ambiguity in the Spreckels judgment and showed that the Spreckels judgment fixed the boundary. Applying res judicata based on the Spreckels judgment, the court concluded that judgment barred Plaintiffs' first and second causes of action. On July 11, 2018, the court

9

entered judgment in favor of State and against Plaintiffs.  Plaintiffs timely filed a notice of appeal.

DISCUSSION

*Section I*

*Quiet Title Causes of Action*

Plaintiffs contend the trial court erred by finding that extrinsic evidence showed the Spreckels judgment fixed the boundaries of their properties with the Bay tidelands and therefore the doctrine of res judicata applied based on that judgment to bar their quiet title causes of action (i.e., first and second causes of action).  State disagrees and asserts the court properly concluded, based on its consideration of the extrinsic evidence, that res judicata applied to bar Plaintiffs' quiet title causes of action.[2]

A

*Res judicata*.  " 'Res judicata' describes the preclusive effect of a final judgment on the merits.  Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. . . . Under the doctrine of res judicata, if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant serves as a bar to further litigation of the same cause of action."  (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896-897 (*Mycogen Corp.*).)  Under the

_____

[2]     Port filed a respondent's brief joining in State's argument that res judicata bars Plaintiffs' quiet title causes of action.

10

doctrine of res judicata, "all claims based on the same cause of action must be decided in a single suit; if not brought initially, they may not be raised at a later date." (*Id*. at p. 897.) Res judicata, or claim preclusion, applies when: "(1) the decision in the prior proceeding is final and on the merits; (2) the present proceeding is on the same cause of action as the prior proceeding; and (3) the parties in the present proceeding or parties in privity with them were parties to the prior proceeding." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1202 (*Federation of Hillside & Canyon Assns.*).) If those requirements are satisfied, res judicata applies not only to the issues actually litigated in the prior proceeding, but also to those issues that could have been litigated in that proceeding. (*Ibid*.)

Plaintiffs do not dispute that they are in privity with Spreckels or that Port is City's successor-in-interest regarding the Spreckels judgment. At trial, Plaintiffs stipulated that they are in privity with Spreckels, which was the prior owner of their properties. In their opening brief, Plaintiffs concede that Port is the successor-in-interest to City, which was the plaintiff in the Spreckels action.

Plaintiffs also do not dispute that the Spreckels judgment involved the same cause of action. At trial, they conceded: "There was an issue [in the Spreckels action] about the location of the boundary." They further stated: "We don't dispute . . . that there is a line. . . . There is a line that was agree[d] on. And that's ultimately what the Court entered its [Spreckels] judgment on."

Accordingly, rather than contesting the trial court's conclusion that the three elements for application of res judicata were satisfied as to Plaintiffs' first and second

11

causes of action, Plaintiffs challenge the court's interpretation of the Spreckels judgment based on the extrinsic evidence admitted at trial. In particular, Plaintiffs challenge both the scope of the evidence admitted in interpreting the facially ambiguous Spreckels judgment and the court's finding, based on that evidence, that the Spreckels judgment fixed the boundary between their properties and the Bay tidelands. We address those issues *post*.

B

*Admissible extrinsic evidence generally*. Plaintiffs assert that in deciding the meaning of the facially ambiguous Spreckels judgment, the court should have admitted extrinsic evidence that was limited to only "evidence from the four corners of the prior case itself." They argue the court should not have admitted and considered extrinsic evidence other than the Spreckels judgment and the record in the Spreckels case, including the pleadings therein. However, none of the cases cited by Plaintiffs supports their restrictive view of extrinsic evidence that is admissible to interpret an ambiguous judgment or other written document.

"If an order [or judgment] is ambiguous, the reviewing court may examine the record for its scope and effect and may look at the circumstances of its making. [Citation.] Extrinsic evidence is allowed to determine the parties' intent when a stipulated order [or judgment] is ambiguous. [Citation.] Unless there are conflicts in the extrinsic evidence, the interpretation of a stipulated . . . order [or judgment] is reviewed de novo." (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 27.) "It has long been established that extrinsic evidence is admissible to prove what the parties intended by

12

ambiguous language appearing in a . . . settlement agreement incorporated and merged in a judgment . . . since '. . . courts do not hesitate to consider all of the admissible extrinsic evidence correctly to interpret their decrees.' [Citations.]" (*In re Marriage of Trearse* (1987) 195 Cal.App.3d 1189, 1192.) "In California a party is entitled to introduce extrinsic evidence in support of his interpretation of language in an agreement embodied in a writing, provided the evidence is offered to support a meaning to which the language is reasonably susceptible." (*Ibid.*)

"The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is *relevant* to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 (*Pacific Gas & E. Co.*), italics added.) In interpreting a contract or other written instrument, the goal is to "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) The mutual intention of the parties "is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 (*Morey*).) For example, "a deed indefinite in its terms may be made certain by the conduct of the parties acting under it." (*People v. Ocean Shore Railroad* (1948) 32 Cal.2d 406, 414 (*Ocean Shore*).)

13

If a judgment or other written instrument is reasonably susceptible to two meanings, as we concluded in *SLPR I* that the Spreckels judgment is, the judgment or instrument is ambiguous and extrinsic evidence is admissible to aid in interpreting it. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.)  When the admissible extrinsic evidence is not conflicting, "construction of the instrument is a question of law, and the appellate court will independently construe the writing."  (*Id*. at p. 1166.)  Because the extrinsic evidence presented in this case was not in conflict, we do not defer to the trial court's construction of the Spreckels judgment and instead independently consider the extrinsic evidence and construe that judgment to determine whether it fixed the boundaries of Plaintiffs' properties with the Bay tidelands or whether it retained an ambulatory MHTL line.

Contrary to Plaintiffs' assertion, the extrinsic evidence admissible to show the parties' mutual intention regarding their settlement agreement discussed *post*, as expressed in the Spreckels judgment, is not limited to only the Spreckels judgment and the record in that case.  Rather, all extrinsic evidence that is relevant to prove the parties' mutual intention is admissible.  (*Pacific Gas & E. Co.*, *supra*, 69 Cal.2d at p. 37.)  In the context of an ambiguous judgment, "to satisfy the burden of proof to establish res judicata, a defendant may present extrinsic evidence *in addition to* the judgment and the entire record of proceedings."  (*In re Marriage of Snyder* (1979) 95 Cal.App.3d 636, 638 (*Snyder*), italics added.)  To prove the meaning of an ambiguous judgment, "the party may resort to the judgment, the record of the proceedings, *and extrinsic evidence*."  (*Casad v. Qualls* (1977) 70 Cal.App.3d 921, 927, italics added (*Casad*).)  Therefore,

14

extrinsic evidence in addition to the Spreckels judgment and the record in that case is admissible, such as evidence regarding the surrounding circumstances under which the parties negotiated or entered into the settlement agreement, the object and nature of the settlement agreement, and the subsequent conduct of the parties. (*Morey*, *supra*, 64 Cal.App.4th at p. 912.) None of the cases cited by Plaintiffs hold that extrinsic evidence other than the judgment and record in that case is inadmissible. (See, e.g., *Rancho Pauma Mutual Water Co. v. Yuima Municipal Water Dist.* (2015) 239 Cal.App.4th 109, 115 (*Rancho Pauma*) ["If a judgment is ambiguous, we *may* examine the entire record to determine its scope and effect, including the pleadings," italics added]; *Goodman v. Dam* (1931) 112 Cal.App. 244, 246 ["The usual and appropriate manner of [proving the res judicata effect of a judgment] is to offer the judgment roll and other parts of the record. . . . [The inquiry] extends to the pleadings and other documents prepared and filed in the case, agreements of counsel on file, stenographic reports or minutes of the testimony taken, the evidence submitted . . . ."].) The fact that some cases list certain types of extrinsic evidence that "may" be admitted to prove the meaning of an ambiguous judgment does not show that other types of extrinsic evidence are inadmissible to prove the judgment's meaning. We reject Plaintiffs' assertion to the contrary. If certain extrinsic evidence is relevant to prove the meaning of an ambiguous judgment, that evidence is admissible whether or not it was part of the record in that case. (*Snyder*, at p. 638; *Casad*, at p. 927; *Morey*, at p. 912.)

15

C

*Artificial accretions rule*.  Before discussing the extrinsic evidence admitted in this case, we briefly review California law regarding the determination of the boundary between tidelands and uplands.  In *SLPR I*, we recognized the general rule " 'that a line shown on a map which runs along the edge of the ocean [or other body of water] is a meander line, used to ascertain the quantity of land subject to sale and to show the sinuosities of the shore, and that the *high tide line* [or MHTL], not the meander line, *is the true legal boundary*.' " (*SLPR I*, *supra*, at pp. 19-20, quoting *Lechuza Villas West v. California Coastal Com.* (1997) 60 Cal.App.4th 218, 240, italics added.)  However, we noted "there is an exception to that general rule in cases of artificial accretions resulting from artificial causes." (*SLPR I*, at p. 20.)  In *State of Cal. ex rel. State Lands Com. v. Superior Court* (1995) 11 Cal.4th 50 (*State Lands*), the California Supreme Court stated:

> "As between the state and private upland owners, land along tidelands and navigable rivers that accretes by artificial means, such as local dredging and construction of wing dams and levees, remains in state ownership, and does not go to the upland owner. . . .  We . . . should narrowly construe what is artificial under the California rule. Accretion is artificial if directly caused by human activities in the immediate vicinity of the accreted land.  But accretion is not artificial merely because human activities far away and, in the case of hydraulic mining, long ago contributed to it." (*State Lands*, *supra*, 11 Cal.4th at p. 56.)

The Supreme Court described the artificial accretions rule, stating:  " [A]ccretions formed gradually and imperceptibly, but caused entirely by artificial means—that is, by the works of man, such as wharves, groins, piers, etc., and by the dumping of material into the ocean—belong to the state, or its grantee, and do not belong to the upland

16

owner.' " (*State Lands*, *supra*, 11 Cal.4th at pp. 69-70, quoting *Carpenter v. City of Santa Monica* (1944) 63 Cal.App.2d 772, 794 (*Carpenter*).)

The California Supreme Court reaffirmed California's artificial accretion rule and, to minimize problems of proof regarding the direct cause of accretion, the court limited the artificial accretion rule to human activities in the immediate vicinity of the accreted area, stating:

> "We thus hold, consistent with our prior cases, that accretion is artificial if directly caused by human activities, such as the dredging, wing dams or levees cited in this case, that occurred in the immediate vicinity of the accreted land. Accretion is not artificial merely because human activities far away contributed to it. The dividing line between what is and is not in the immediate vicinity will have to be decided on a case-by-case basis, keeping in mind that the artificial activity must have been the *direct* cause of the accretion before it can be deemed artificial. The larger the structure or the scope of human activity such as dredging or dumping, the farther away it can be and still be a direct cause of the accretion, although it must always be in the general location of the accreted property to come within the artificial accretion rule." (*State Lands*, *supra*, 11 Cal.4th at pp. 79-80.)

In light of California's artificial accretions rule, we discuss *post* whether the extrinsic evidence admitted in this case shows there were artificial improvements in the immediate vicinity of Plaintiffs' properties prior to the Spreckels judgment and, if so, whether the parties' mutual intention was for the Spreckels judgment to fix the boundary line between Spreckels's property and the Bay tidelands at its last natural MHTL line.

D

*Extrinsic evidence in this case*. At trial, the court admitted extensive extrinsic evidence that was probative on the issues of whether there were artificial improvements

17

in the immediate vicinity of Plaintiffs' properties prior to the Spreckels judgment and whether the parties' mutual intention in the Spreckels case was for the Spreckels judgment to fix the boundary between Spreckels's property and the Bay tidelands or to simply locate the current ambulatory MHTL at the time of the judgment. At trial, State presented the expert testimony of Steve Lehman, a California licensed land surveyor, regarding exhibit 3089, which was a diagram by the State Board of Harbor Commissioners showing planned development of the Bay as of the late 1800's. Lehman stated that exhibit 3089 showed planned development of "fairly long wharfs" in the area along the shoreline of First Street in City and, in particular, in the vicinity of Plaintiffs' properties.

The court also admitted exhibit 713, consisting of City of Coronado Council (City Council) minutes dated April 15, 1929, and stating, in part, "Superintendent of Operation [*sic*] reported he had investigated the matter of *wharves west of the ferry* [i.e., in the vicinity of Plaintiffs' properties]. . . . City Attorney suggested that owners of wharves be required to take out tideland leases." (Italics added.) Exhibit 713 showed the City Council passed a resolution that owners of all wharves on City tidelands be instructed to obtain a permit or lease on the tideland property they are using.

In November 1929, the City Council formed a committee to recommend a civil engineer, surveyor, and legal counsel "in order that the metes and bounds of [City's] tidelands be accurately determined and that necessary action be taken for the establishing of title to such portion of the tidelands, as should be properly vested in [City]." In February 1930, the City Council authorized the city attorney to commence quiet title

18

proceedings "to fix and determine the tidelands that should be the property of [City], this question having been at issue for many years and both the Spreckels Interests and ourselves being uncertain as to the location of the [MHTL] around [City]."

City retained Charles T. Leeds to perform a survey of City's north and west tidelands boundary. In a March 24, 1930 letter to City's attorney, Leeds stated: "A considerable additional number of excavations are necessary, however, to definitely fix the location of the historical and *now buried beach line* at certain critical locations." (Italics added.) In a May 3, 1930 letter to City's counsel in preparation for City's quiet title action, Leeds enclosed blueprints showing "the courses and distances describing the line of [MHTL] around [City] on the Bay side." Importantly, Leeds stated: "I have been getting into shape a list of holes which were dug by us, necessary to show where the line of [MHTL] was *before* any *artificial filling was done*, together with complete logs of each, and a map showing their location." (Italics added.) In a May 16, 1930 letter to the City Council, Leeds reported that he had completed the field survey of the MHTL along the Bay. In particular, he stated:

> "Where no artificial filling has been done the line was surveyed as it now exists. Where, however, it was *apparent* that there has been *some artificial filling*, excavations were made at strategic points, the line of demarkation [*sic*] between the original and the filled material was observed and recorded, and the line of [MHTL] as it existed prior to the artificial filling was determined. The record of these holes, including surface elevations of original ground and material through which excavation was made, has all been recorded. In certain cases samples of the material has been saved for inspection." (Italics added.)

Leeds further stated:

> "It is our understanding that this line as now surveyed and described is to be made the basis of negotiations or legal action with a view to its establishment as the official boundary of the tidelands of [City], and that you desire the completion of our contract by marking the line with concrete monuments and furnishing the City with a final map and certified copy of the field notes be deferred until the said line shall have been rendered official either by definite agreement between the City and the various claimants or until a court decree thereon shall have been obtained.  [¶]  . . .

> "As soon as definite and final agreement shall have been reached between the City and the various claimants as to the proper official location of the [MHTL], or immediately upon the rendering of a judicial decision as to the location thereof, we will at once proceed to set concrete monuments replacing the present wood stakes and complete the official map."

Lehman testified that his review of Leeds's survey work showed that Leeds was locating the historic MHTL *prior to artificial fill* placed over the MHTL.[3]  Alternatively stated, in locations where there was artificial fill placed over the MHTL, the boundary line that Leeds surveyed was the MHTL prior to the placement of that fill, and in locations where there was no fill, the boundary line remained the MHTL as it then existed.  Lehman expressed his expert opinion that Leeds's survey of City's tidelands boundary, with its courses and distances description, was extremely accurate.  Lehman stated that Leeds replaced his temporary wood stake markers with concrete monuments

---

[3]     Michael J. Pallamary, Plaintiffs' survey expert, testified that he also believed that Leeds had "drill[ed] holes" to determine where there had been fill or artificial migration.

20

after the Spreckels judgment, reflecting a "permanent fixed line" for City's tidelands boundary.

In July 1930, City filed its quiet title action against Spreckels and other defendants. City's complaint asserted City was the owner of property situated in the Bay, according to a courses and distances description of City's tidelands boundary that presumably was prepared by Leeds. In September 1930, Spreckels filed its answer, denying the correctness of City's description of its tidelands boundary. Spreckels asserted instead that "on July 31, 1930, and at all times prior to that date, the [MHTL] in the Bay . . . on the [City's] side of the said bay was, and is now, a line described as follows, to wit: [setting forth a lengthy surveyor's description of angles or courses and distances representing about 134 lines that run from certain stations, concrete monuments, points, or stakes to other stations, monuments, points, or stakes]." Spreckels asserted that it was the owner of all premises lying landward from the courses and distances boundary line that it described as the MHTL in the Bay.

At an August 17, 1931 City Council meeting, City's mayor reported that Leeds had been employed by City "to fix and determine" City's tidelands boundary because both Spreckels and City were uncertain as to its location. The mayor stated that Spreckels's counsel consulted with City's counsel and proposed a form of agreement describing the metes and bounds of that boundary, which agreement seemed to be equitable and was apparently acceptable to Spreckels. The mayor then offered a resolution, titled "Determining Boundary of Tidelands," which the City Council adopted. City's counsel described the benefits to City of the proposed settlement agreement, stating: "[I]ts good

21

is inestimable and he could not place the value it will bring the City in the future by fixing this tide line. It is more than fair to the intentions of this Council, as it will prove on being fixed." The City attorney concurred, stating that the settlement agreement will save City considerable litigation expenses and "will finally determine the question as to the high tide line and as to what the City boundary is and will be."[4]

Also on August 17, presumably after the City Council meeting that day, City filed an amended complaint in its quiet title action, alleging its Bay tidelands boundary was as set forth in a revised courses and distances description, which presumably was the description set forth in the settlement agreement proposed by Spreckels and accepted by the City Council.[5]

On August 18, Spreckels filed an answer to the amended complaint, admitting that "the line described by [City] in the said paragraph IV [of the amended complaint] as the [MHTL] in the Bay of the City['s] . . . side of the said bay, is, and on the 21st day of July,

---

[4]     An August 17, 1931, newspaper article reported that the City Council's resolution "instructed its legal advisers to consent to a stipulation under which the court shall confirm the agreed boundary of Coronado's tidelands and by court order shall fix the legal boundaries of the [C]ity." The article noted that the tideland settlement agreement was agreed to "by representatives of the [C]ity and attorneys for the San Diego and Arizona railroad, the Spreckels interests and others made defendants in the suit filed by the [C]ity."

[5]     Also, in a stipulation filed with the court on August 17, 1931, City and The Coronado Water Company, apparently an affiliate of Spreckels and a codefendant in the Spreckels action, agreed that "a Decree may be entered herein fixing and determining the line of ordinary high tide in the Bay of San Diego, on the Coronado side of said Bay as agreed between [City] and the other defendants in this action." Pallamary admitted at trial that The Coronado Water Company was held or controlled by Spreckels.

1930, and at all times prior to that date, was the [MHTL] in the said bay on the City['s] . . . side thereof . . . ." Its answer then set forth a courses and distances boundary description, which presumably was the description set forth in the settlement agreement proposed by Spreckels and accepted by the City Council.

On August 19, the court entered the Spreckels judgment, setting forth its determination of the boundary between City's Bay tidelands property and Spreckels's upland property, as quoted *ante*. A newspaper headline that day reported that City's tidelines were "fixed." An article further reported, inter alia, that one of Spreckels's attorneys had been present at the meeting at which the City Council adopted the resolution approving the settlement agreement stipulating to the agreed fixed tidelands boundary.

E

*Analysis*. Based on our independent review of the undisputed extrinsic evidence in the trial record, we conclude, as a matter of law, that the Spreckels judgment fixed the boundaries of Plaintiffs' properties with the Bay tidelands. The evidence showed that there had been wharves and other artificial improvements constructed in the immediate vicinity of Plaintiffs' properties along First Street. As of the late 1800's, construction of long wharves was planned along the First Street shoreline and, in particular, in the vicinity of Plaintiffs' properties. In 1929, the City Council referred to the issue of "wharves west of the ferry [i.e., in the vicinity of Plaintiffs' properties]" and passed a resolution that owners of all wharves on City tidelands be instructed to obtain a permit or lease on the tideland property they were using. Therefore, the undisputed evidence

23

shows that, as of 1929, there were multiple wharves constructed along the First Street shoreline west of the ferry landing, which area includes Plaintiffs' properties.

Furthermore, evidence regarding Leeds's survey work confirmed the existence in 1930 of artificial fill in the area of Plaintiffs' properties. In one 1930 letter, Leeds referred to "[a] considerable additional number of excavations . . . necessary . . . to definitely fix the location of the historical and now buried beach line at certain critical locations." In another 1930 letter, he enclosed blueprints showing "the courses and distances describing the [MHTL] around [City] on the Bay side," and stated: "I have been getting into shape a list of holes which were dug by us, necessary to show where the [MHTL] was before any artificial filling was done, together with complete logs of each, and a map showing their location." In another 1930 letter, Leeds reported that he had completed the field survey of the MHTL and stated that "[w]here . . . it was apparent that there has been some artificial filling, excavations were made at strategic points, the line of demarkation [*sic*] between the original and the filled material was observed and recorded, and the [MHTL] as it existed prior to the artificial filling was determined. The record of these holes, including surface elevations of original ground and material through which excavation was made, has all been recorded." Leeds's 1930 survey work therefore showed that he located the historic MHTL prior to the placement of artificial fill over the MHTL. Where there had been artificial fill placed over the MHTL, the boundary line that Leeds surveyed was the MHTL prior to the placement of that fill. Although the evidence regarding Leeds's survey work did not show specifically where those areas of artificial fill were found, we infer from the evidence discussed *ante*

24

regarding the existence of wharves along the First Street shoreline in the vicinity of Plaintiffs' properties that Leeds presumably found artificial fill in the immediate vicinity of those properties. Because extrinsic evidence shows that there were both artificial improvements (e.g., wharves) and artificial fill in the immediate vicinity of Plaintiffs' properties, the artificial accretions rule applies to support an interpretation that the Spreckels judgment fixed the boundary of Plaintiffs' properties on the Bay tidelands. As discussed *ante*, "land along tidelands . . . that accretes by artificial means . . . remains in state ownership[] and does not go to the upland owner. . . . Accretion is artificial if directly caused by human activities in the immediate vicinity of the accreted land." (*State Lands*, *supra*, 11 Cal.4th at p. 56.) *State Lands* reasoned: " '[A]ccretions formed gradually and imperceptibly, but caused entirely by artificial means—that is, by the works of man, such as wharves, groins, piers, etc., and by the dumping of material into the ocean—belong to the state, or its grantee, and do not belong to the upland owner. . . . If accretions along an entire bay caused by the construction of a pier or wharf were held to belong to the upland owners as against the state, or its grantee, it would mean, in some cases, that the power of the municipality to improve its harbor would be cut off unless the accreted areas were condemned. It would mean that every time the state or its grantee determined to build a wharf or pier, or to grant a permit or franchise for such construction, it would be granting away a material portion of the tidelands along the entire bay that might later be covered by artificial accretions. . . . Such a rule would be violative of fundamental concepts of public policy.' " (*State Lands*, at pp. 69-70, quoting *Carpenter*, *supra*, 63 Cal.App.2d at p. 794.) Accordingly, based on the evidence showing

25

artificial improvements and artificial fill in the immediate vicinity of Plaintiffs' properties, it is reasonable to infer that the parties to the Spreckels action and the trial court intended to fix the location of City's tidelands boundary with Plaintiffs' properties (and elsewhere) rather than retaining an ambulatory MHTL boundary that changes over time.

More importantly, the extrinsic evidence admitted at trial overwhelmingly shows the parties to the Spreckels action had the mutual intent in 1931 to fix the boundaries between City's Bay tidelands and the landward properties. Because the Spreckels judgment was facially ambiguous regarding that mutual intent, we review the extrinsic evidence admitted at trial to determine what the parties' mutual intention was at the time of that 1931 judgment. As discussed *ante*, the mutual intention of the parties "is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey*, *supra*, 64 Cal.App.4th at p. 912.) Based on our independent review of the extrinsic evidence admitted at trial, we conclude the evidence overwhelmingly shows the parties had the mutual intent to fix the boundary between City's Bay tidelands and the landward properties. In February 1930, the City Council authorized the City attorney to commence quiet title proceedings "to fix" City's tidelands boundary. In a May 16, 1930 letter to the City Council, Leeds stated:

26

"It is our understanding that this [courses and distances boundary] line as now surveyed and described is to be made *the basis of negotiations or legal action* with a view to its establishment as the official boundary of the tidelands of [City], and that you desire the completion of our contract by marking the line with *concrete monuments* and furnishing the City with a *final map . . .* be *deferred until* the said line shall have been rendered official either by definite *agreement* between the City and the various claimants *or* until a *court decree* thereon shall have been obtained.  [¶]  . . .  [¶]

"As soon as definite and final agreement shall have been reached between the City and the various claimants as to the proper official location of the [MHTL], or immediately upon the rendering of a judicial decision as to the location thereof, we will at once proceed to set concrete monuments replacing the present wood stakes and complete the official map."  (Italics added.)

That letter shows that Leeds's courses and distances survey was intended by City not only to provide a basis for negotiations with the defendants in the Spreckels action regarding the location of the Bay tidelands boundary, but also that after the parties reached a settlement agreement and/or there was a court determination, he would make that official boundary line permanent by placing concrete monuments marking that boundary and recording a final survey map.  Also, Lehman testified that after the Spreckels judgment was entered, Leeds replaced his temporary wood stake markers with concrete monuments, reflecting a "permanent fixed line" for City's tidelands boundary.  The above evidence supports our conclusion that the parties to the Spreckels action negotiated the location of a *fixed* boundary, not an ambulatory MHTL boundary.

The parties' pleadings provide further support for our conclusion that their mutual intention was to fix City's Bay tidelands boundary.  City's original 1930 complaint alleged that it was the owner of property situated in the Bay, according to a *courses and*

27

*distances description* of City's tidelands boundary that presumably was prepared by Leeds. By describing that tidelands boundary line in terms of a courses and distances survey, City, in effect, expressed its objective intent to permanently "fix" City's Bay tidelands boundary line. In its 1930 answer, while denying that City's boundary description was correct, Spreckels asserted that instead of City's alleged boundary, "on July 31, 1930, and *at all times prior to that date*, the [MHTL] in the Bay . . . on the [City's] side of the said bay was, and is now, a line described as follows, to wit: [setting forth a lengthy surveyor's description of angles or *courses and distances* representing about 134 lines that run from certain stations, concrete monuments, points, or stakes to other stations, monuments, points, or stakes]." By alleging in its answer that City's tidelands boundary was "at all times prior to" July 31, 1930, a line as described by a *courses and distances* survey, Spreckels also expressed its objective intent to, in effect, permanently fix City's Bay tidelands boundary line. Therefore, the objective manifestations of both City and Spreckels in their original pleadings expressed their mutual intention to permanently fix City's Bay tidelands boundary, albeit with different fixed boundary lines. Contrary to Plaintiffs' apparent assertion, our review of the parties' pleadings does not support a reasonable inference that Spreckels or any of the other defendants in that action sought to have an ambulatory MHTL boundary declared or determined by the court.

In addition to the evidence *ante*, extrinsic evidence during the period immediately prior to and after the Spreckels judgment provides further support for our conclusion that the parties' mutual intention was to permanently fix City's Bay tidelands boundary. At

28

the August 17, 1931 City Council meeting, City's mayor stated that Leeds had been employed by City "to fix and determine" City's tidelands boundary. Importantly, the mayor then reported that *Spreckels's counsel* consulted with City's counsel and *proposed a form of agreement describing the metes and bounds of that boundary*, which agreement seemed to be equitable and was apparently acceptable to Spreckels. The City Council then adopted a settlement agreement that presumably was proposed by Spreckels's counsel, determining City's tidelands boundary per that metes and bounds (i.e., courses and distances) description. City's counsel described the benefits to City of the proposed settlement agreement, stating: "[I]ts good is inestimable and he could not place the value it will bring the City in the future by *fixing* this tide line. It is more than fair to the intentions of this Council, as it will prove on being *fixed*." (Italics added.) The City attorney concurred, stating that the settlement agreement will save City considerable litigation expenses and "will finally determine the question as to the high tide line and as to *what the City boundary is and will be*." (Italics added.) Presumably to effect that settlement agreement, City then filed an amended complaint in its quiet title action, alleging its Bay tidelands boundary was as set forth in a revised courses and distances description, which apparently was the description set forth in the settlement agreement proposed by Spreckels and accepted by the City Council. The following day, also presumably to effect the settlement agreement, Spreckels filed its answer to the amended complaint, admitting that boundary line described in City's amended complaint "*is, and on the 21st day of July, 1930, and at all times prior to that date, was*" City's Bay tidelands boundary. (Italics added.) Its answer then set forth a courses and distances

29

boundary description, which apparently was the description set forth in the settlement agreement proposed by Spreckels and accepted by the City Council. Accordingly, we conclude the parties' subsequent pleadings, as with their original pleadings, constituted objective manifestations of their mutual intention to permanently fix City's Bay tidelands boundary, rather than to retain an ambulatory MHTL boundary.

On August 19, 1931, presumably accepting the parties' settlement agreement and concurring that the parties' mutual courses and distances description of City's Bay tidelands boundary line was correct, the court entered the Spreckels judgment that set forth its determination of the boundary between City's Bay tidelands property and Spreckels's upland property. We conclude that by adopting the parties' agreed-on courses and distances boundary description, the court presumably intended to permanently fix City's Bay tidelands boundary, even though its judgment was, as we concluded in *SLPR I*, ambiguous on its face regarding that intent.

Actions subsequent to the Spreckels judgment also support our conclusion that the parties had the mutual intention to permanently fix City's Bay tidelands boundary. A newspaper article on August 19, 1931, reported that the judgment "fixed" City's tidelines and that one of Spreckels's attorneys had been present at the meeting at which the City Council adopted the resolution approving the settlement agreement stipulating to the agreed fixed tidelands boundary. Also, after the Spreckels judgment in 1931, Leeds set the concrete monuments permanently marking that fixed boundary line and prepared an official map of that fixed boundary line, which was recorded in 1932 as Map 121. Map 121 was subsequently used by the Legislature to describe City's Bay tidelands boundary

30

and used in a survey of Plaintiffs' lots. In 1947, the Legislature enacted a statute "to redescribe and *fix*" the boundary of the Bay tidelands conveyed to City in 1923, describing that boundary in pertinent part:

> "Beginning at the intersection of the ordinary high water mark of Glorietta Bay . . . and running thence from said monument along the said ordinary high water mark of Glorietta Bay, the ordinary high water mark of San Diego Bay, and the ordinary high water mark of Spanish Bight *following the courses and distances* delineated and tabulated *on* a map . . . designated Miscellaneous *Map No. 121* . . . to a six inch by six inch concrete monument . . . set at the intersection of the ordinary high water mark in Spanish Bight with the west boundary of the City of Coronado . . . ." (Italics added.)

In 1949, a record of survey was recorded that apparently created Plaintiffs' individual lots and described their bayside boundaries as the "[MHTL] of San Diego Bay according to Miscellaneous Map No. 121." Accordingly, the above evidence shows that since the Spreckels judgment in 1931, the fixed boundary described in Map 121, reflecting that judgment, was relied on not only by the parties to the Spreckels judgment, but also by the Legislature, to describe City's Bay tidelands boundary. Plaintiffs have not cited any evidence showing that after the Spreckels judgment either the parties or the Legislature considered that boundary to be an ambulatory MHTL boundary. Therefore, the subsequent conduct of the parties and others supports our conclusion that the Spreckels judgment permanently fixed City's Bay tidelands boundary. (*Morey*, *supra*, 64 Cal.App.4th at p. 912; *Ocean Shore*, *supra*, 32 Cal.2d at p. 414.)

Finally, expert testimony presented at trial supports our conclusion that the Spreckels judgment fixed City's Bay tidelands boundary rather than retaining an ambulatory MHTL boundary. Pallamary, Plaintiffs' expert, testified the general rule in a

31

metes and bounds description is that words following the terms "to" and "along" are primary and controlling "calls" because they control the direction and bounds and words that precede the terms "to" and "along" are secondary or informative. Our review of the Spreckels judgment shows that although it initially refers to the MHTL as City's Bay tidelands boundary, it follows that reference with a specific metes and bounds, or courses and distances, boundary description that uses terms such as "at" and "along" while specifying certain directions and distances of its boundary lines (e.g., "thence North 59 [degrees] 35' 00' West a distance of 130.38 feet to Station No. 1"). Furthermore, Lehman, Defendants' expert, testified that the description of City's Bay tidelines boundary in the Spreckels judgment described a permanent fixed line in the form of a metes and bounds description and not an ambulatory MHTL boundary. Therefore, the Spreckels judgment's metes and bounds fixed boundary description is primary and controlling and its initial MHTL reference is merely secondary or informative. Based on our independent review of the Spreckels judgment and the extrinsic evidence admitted at trial, we reject Pallamary's proffered opinion that the Spreckels judgment is "hopelessly irreconcilable" because it referred to the MHTL while also including a metes and bounds description. On the contrary, for the reasons discussed *ante*, we conclude the Spreckels judgment permanently fixed City's Bay tidelands boundary.

F

*Evidence of Spreckels's Intentions*. Plaintiffs assert that to prove the meaning of the Spreckels judgment based on the mutual intention of the parties to the Spreckels action, evidence showing Spreckels's intent to fix City's Bay tidelands boundary was

32

required. They further assert that because there was no evidence admitted showing Spreckels's intent, the Spreckels judgment cannot be interpreted as fixing City's Bay tidelands boundary. We disagree.

First, the cases cited by Plaintiffs, *Rancho Pauma*, *supra*, 239 Cal.App.4th 109 and *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232 (*City of Manhattan Beach*), do not support Plaintiffs' apparent argument that any determination resolving an ambiguity in a judgment or other written instrument requires evidence of each party's subjective intent. In *Rancho Pauma*, we stated: "If a judgment is ambiguous, we may examine the entire record to determine its scope and effect, including the pleadings." (*Rancho Pauma*, at p. 115.) We further stated: " '[T]he primary object of all interpretation is to ascertain and carry out the intention of the parties." (*Ibid*., quoting *City of Manhattan Beach*, at p. 238.) Those cases merely restate the general rule that in interpreting a contract or other written instrument, the goal is to "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) The mutual intention of the parties "is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey*, *supra*, 64 Cal.App.4th at p. 912.) Accordingly, our task in interpreting an ambiguous judgment or other written instrument is to ascertain the *mutual intention* of

33

the parties based on their *objective manifestations*. In so doing, we do not consider, or require evidence showing, each party's subjective intent.

Second, contrary to Plaintiffs' assertion, there is ample evidence showing the mutual intention of the parties to the Spreckels action was to permanently fix City's Bay tidelands boundary. As discussed *ante*, City's original complaint asserted it was the owner of property situated in the Bay, according to a *courses and distances* description of City's tidelands boundary. Spreckels's answer denied the correctness of City's description of its tidelands boundary, but asserted instead that City's tidelands boundary was a line described per a surveyor's description of angles or *courses and distances* representing about 134 lines. At the August 17, 1931 City Council meeting, City's mayor reported that *Spreckels's* counsel had consulted with City's counsel and *proposed a form of agreement describing the metes and bounds* of City's Bay tidelands boundary, which agreement was apparently acceptable to Spreckels. The City Council then adopted a resolution that accepted that proposed settlement agreement. City then filed an amended complaint in its quiet title action, alleging its Bay tidelands boundary was as set forth in a revised *courses and distances* description, and Spreckels's answer admitted that the line described in City's amended complaint was the correct boundary, which presumably was the *courses and distances* description set forth in the settlement agreement proposed by Spreckels and accepted by the City Council. By asserting in their original pleadings and in their postsettlement agreement pleadings that City's Bay tidelands boundary line was a courses and distances line as described in those pleadings, the parties objectively expressed their mutual intention to permanently fix City's Bay tidelines boundary instead

34

of retaining an ambulatory MHTL boundary.[6] Plaintiffs have not cited any evidence showing the parties' mutual intention was to retain an ambulatory MHTL boundary.[7]

## G

*Weight of extrinsic evidence*. Plaintiffs also assert that to prove the meaning of the ambiguous language in the Spreckels judgment and for res judicata to apply, State was required to present unequivocal evidence that the mutual intention of the parties to the Spreckels action was to fix City's Bay tidelands boundary. However, the cases cited by Plaintiffs do not support such a novel standard of proof. In *Casad*, *supra*, 70 Cal.App.3d 921, cited by Plaintiffs, the court stated: " 'In view of the certainty required in estoppels, the application of the doctrine of res judicata cannot be made by inference or surmise as to the effect of the judgment. If, on the face of the record, anything is left to conjecture as to what was necessarily involved and decided, there is no estoppel in it when it is pleaded, and nothing conclusive in it when it is offered in evidence.' [Citations.]" (*Id.* at p. 927, quoting 29 Cal.Jur.2d, Judgments, § 239, pp. 200-201; see also *Estate of Miller*

---

6      In so concluding, we need not consider, or address the effect of, the settlement agreement between City and The Coronado Water Company, described *ante*. Likewise, we need not consider, or address the effect of, evidence showing that the parties may have intended to fix City's Bay tidelands boundary, in part, because future development along the Bay shoreline was anticipated. (See, e.g., *Muchenberger v. City of Santa Monica* (1929) 206 Cal. 635, 642-643.)

7      In fact, Pallamary testified regarding the boundary immediately before the Spreckels action that "[t]here was confusion, but the boundary had been *fixed by all of that artificial activity* notwithstanding whatever they were debating in the litigation." (Italics added.)

(1951) 104 Cal.App.2d 1, 19; Code Civ. Proc., § 1911 ["That only is deemed to have been adjudged in a former judgment which appears on its face to have been so adjudged, or which was actually and necessarily included therein or necessary thereto."].) However, our interpretation of the Spreckels judgment does not contravene the rule set forth in *Casad*. Given the pleadings in the Spreckels action and the overwhelming extrinsic evidence clarifying the facially ambiguous Spreckels judgment as discussed above, we conclude there is nothing in the Spreckels judgment that was left to conjecture or inference as to what was necessarily involved in the Spreckels action or what the Spreckels judgment decided. (Cf. *Casad*, at p. 927.) Therefore, the doctrine of res judicata may be applied to this case based on the Spreckels judgment. To the extent *Casad* implies, as Plaintiffs apparently assert, that a court cannot consider extrinsic evidence in order to clarify an ambiguous judgment, we disagree with such a rule and decline to apply it to the facts in this case. Furthermore, City's Bay tidelands boundary was expressly litigated in the Spreckels action and therefore the Spreckels court's determination of that boundary was necessarily included and decided in the Spreckels judgment. (*Ibid*.) Therefore, res judicata applies to that judgment's determination of City's boundary. (Code Civ. Proc., § 1911; *Mycogen Corp.*, *supra*, 28 Cal.4th at p. 897; *Federation of Hillside & Canyon Assns.*, *supra*, 126 Cal.App.4th at p. 1202.)

Contrary to Plaintiffs' assertion, the extrinsic evidence regarding the meaning of an ambiguous judgment is not required to be "unequivocal" or eliminate all "reasonable

36

doubt."[8]  Rather, if extrinsic evidence is sufficient to persuade a court that an ambiguous

judgment is clarified by the objective manifestations of the parties' mutual intention, then

that judgment may be found to be unambiguous based on the whole record and res

judicata may then be applied.  (Civ. Code, § 1636; *Morey*, *supra*, 64 Cal.App.4th at

p. 912.)  Furthermore, Plaintiffs do not cite any case holding that extrinsic evidence

admitted to clarify an ambiguous judgment must be "unequivocal."  In any event, based

on our review of the extrinsic evidence admitted at trial, we conclude, as discussed *ante*,

that evidence overwhelmingly, if not indisputably, shows the parties' mutual intention

was clear that the Spreckels judgment permanently fix City's Bay tidelands boundary.

Plaintiffs do not cite any evidence showing otherwise.

---

[8]     We decline to follow those decisions of federal courts of appeal cited by Plaintiffs because we, as a California appellate court, are not bound to follow them and they apply the laws of other jurisdictions and are factually inapposite to this case.  (See, e.g., *McNellis v. First Federal Savings & Loan Assn.* (2d Cir. 1966) 364 F.2d 251, 257 ["[A] reasonable doubt as to what was decided in the first action should preclude the drastic remedy of foreclosing a party from litigating an essential issue."]; *Kauffman v. Moss* (3d Cir. 1970) 420 F.2d 1270, 1274 ["Reasonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel."]; *United States v. United Techs. Corp.* (6th Cir. 2015) 782 F.3d 718, 729 ["Because issue preclusion forever *precludes* litigation with respect to a covered finding, courts err on the side of construing prior ambiguous findings or holdings narrowly.  [Citations.]  ('[I]f reasonable doubt exists as to what was decided in the first action, the doctrine of res judicata should not be applied.')."].)

H

*Plaintiffs' remaining assertions.* Plaintiffs also assert that the overwhelming

extrinsic evidence showing the parties' mutual intention was that the Spreckels judgment

permanently fix City's boundary is insufficient for res judicata to apply because

Defendants filed a cross-complaint that alleged an alternative fixed boundary and

recorded a lis pendens based thereon. However, Plaintiffs misconstrue Defendants'

cross-complaint. The cross-complaint primarily sought a determination that the Bayside

boundaries of Plaintiffs' properties be as depicted on Map 121 and, if not so determined,

an alternative determination declaring their boundaries fixed based on artificial accretion

in the 1950's. By seeking alternative relief in the event the court did not find the

Spreckels judgment fixed Plaintiffs' Bayside boundaries in 1931, Defendants did not, as

Plaintiffs apparently assert, abandon their primary allegation that the Spreckels judgment

permanently fixed the Bayside boundaries of Plaintiffs' properties. Contrary to Plaintiffs'

assertion, by filing their cross-complaint and recording a lis pendens based thereon,

Defendants did *not* "implicitly conced[e]" they had not met their burden at trial to show

the Spreckels judgment permanently fixed City's Bay tidelands boundary.

Plaintiffs also assert the trial court applied a lesser burden for application of res

judicata to the Spreckels judgment based on the age of that judgment. However, our

review of the record does not support their assertion that the trial court lessened the

applicable burden of proof based on the age of the Spreckels judgment. The court stated:

> "The *Spreckels* decision was published over [80] years ago. The fact
> of the age of the case is relevant only to the likelihood that the
> exhibits, or briefs from the case[,] might still be available for

38

consideration. If this Court were to limit the extrinsic evidence that could be considered in determining res judicata to the evidence or arguments which were presented in the course of the original proceedings under review, many, if not all cases of this vintage or older might be placed in jeopardy should a question regarding ambiguity of the judgment arise."

By so commenting, the court correctly noted the practical problem of relying solely on court records and pleadings in determining the meaning of an ambiguous judgment that was entered many years ago. Accordingly, the court correctly, as we discussed *ante*, admitted all extrinsic evidence that was relevant to show the objective manifestations of the parties' mutual intention regarding the meaning of the Spreckels judgment. By so doing, the court did not lessen the burden of proof, but rather merely admitted all relevant extrinsic evidence to prove the meaning of the facially ambiguous Spreckels judgment. In any event, based on our own independent review of the extrinsic evidence, we conclude State met its burden to prove that the parties' mutual intention was for the Spreckels judgment to permanently fix City's Bay tidelands boundary.

I

*Application of res judicata.* Because we concluded *ante* that the evidence admitted at trial overwhelmingly shows the parties intended that the Spreckels judgment permanently fix City's Bay tidelands boundary, the facial ambiguity of the Spreckels judgment that we recognized in *SLPR I* has now been resolved. Res judicata, or claim preclusion, applies when: "(1) the decision in the prior proceeding is final and on the merits; (2) the present proceeding is on the same cause of action as the prior proceeding; and (3) the parties in the present proceeding or parties in privity with them were parties to

39

the prior proceeding." (*Federation of Hillside & Canyon Assns.*, *supra*, 126 Cal.App.4th at p. 1202.) As discussed *ante*, Plaintiffs do not dispute that they are in privity with Spreckels or that Port is City's successor-in-interest regarding the Spreckels judgment. Plaintiffs also do not dispute that the Spreckels judgment involved the same issue or cause of action as in their action against Defendants (i.e., the location of their properties' Bayside boundaries). Accordingly, all of the elements for application of the doctrine of res judicata have been satisfied in this case. Therefore, we apply res judicata based on the Spreckels judgment to bar the first and second causes of action alleged by Plaintiffs. (*Mycogen Corp.*, *supra*, 28 Cal.4th at pp. 896-897.)

*Section II*

*Order Sustaining State's Demurrer*

Plaintiffs contend the trial court erred by sustaining State's demurrer to their causes of action for inverse condemnation, nuisance, and removal of lateral support (i.e., the third, fourth, and fifth causes of action). State responds that those causes of action are time-barred based on Plaintiffs' failure to timely challenge the conduct that underlies those claims against it. In particular, State argues that because Plaintiffs did not file a Code of Civil Procedure section 1094.5 petition for writ of mandate within 60 days of its final decisions concurring with the consistency determinations of the Navy and Army, Plaintiffs are statutorily barred by Public Resources Code section 30801 from alleging causes of action against State based on its concurrences with those consistency determinations. As explained *post*, we agree with State's argument.

40

A

*Demurrer standard of review*. A demurrer tests the legal sufficiency of a complaint. (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 869 (*City of Morgan Hill*).) A general demurrer to a complaint asserts the pleading does not state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10, subd. (e); *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 42-43 (*Rakestraw*); *Young v. Gannon* (2002) 97 Cal.App.4th 209, 220.) "In determining whether the complaint states facts sufficient to constitute a cause of action, the trial court may consider all material facts pleaded in the complaint and those arising by reasonable implication therefrom; it may not consider contentions, deductions or conclusions of fact or law." (*Young*, at p. 220.) A statute of limitations defense may be asserted by general demurrer if the complaint shows on its face that the statute bars the action. (*Mitchell v. State Dept. of Public Health* (2016) 1 Cal.App.5th 1000, 1007 (*Mitchell*); *Coalition for Clean Air v. City of Visalia* (2012) 209 Cal.App.4th 408, 419 (*Coalition for Clean Air*).) Nevertheless, " '[a] demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar . . . to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred. [Citation.]' [Citation.]" (*Geneva Towers Ltd. Partnership v. City and County of San Francisco* (2003) 29 Cal.4th 769, 781.)

On appeal after a trial court sustains a general demurrer, we determine de novo the question of whether the complaint alleges facts sufficient to state a cause of action under

41

any legal theory. (*Rakestraw*, *supra*, 81 Cal.App.4th at p. 43.) In so doing, we accept as true all material factual allegations of the complaint, unless contrary to law or facts of which a court may take judicial notice. (*Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 677; *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27.) The plaintiff bears the burden on appeal to show the trial court erred by sustaining a demurrer. (*Rakestraw*, at p. 43.) "A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.) If we conclude after reviewing a complaint that no liability exists as a matter of law, we must affirm the trial court's order sustaining the demurrer. (*City of Morgan Hill*, *supra*, 118 Cal.App.4th at p. 870.) We review a court's denial of leave to amend a complaint on sustaining a demurrer for abuse of discretion. (*Traders Sports v. City of San Leandro* (2001) 93 Cal.App.4th 37, 43 (*Traders Sports*).) On appeal, the appellant must show there is a reasonable possibility that the defect in the complaint can be cured by amendment. (*Ibid*.; *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 841-842 (*Friedland*).)

B

*Relevant procedural background*. On remand after *SLPR I*, Plaintiffs filed the TAC, alleging causes of action, inter alia, for inverse condemnation, nuisance, and removal of lateral support. The TAC alleged that State substantially participated in the three dredging projects by Navy and Army, which projects allegedly caused damage to Plaintiffs' properties. The TAC alleged State substantially participated in all three

42

dredging projects because "State had the power to require changes to all three dredging projects, which is demonstrated as follows: A) in connection with the 1998 Turning Basin dredging project, State objected to the fact that Navy intended to dispose of dredge spoils at an ocean disposal site, rather than using dredge spoils for beach replenishment. State obtained a preliminary injunction halting the dredging project. Navy was only allowed to resume its work on the project when it agreed to contribute $9.6 million toward erosion mitigation measures; [and] B) in connection with the 2004-2005 Central Navigation Channel dredging project, State withheld its consent to the Army Corps' consistency determination until the Army Corps agreed to dispose of dredge spoils off shore of Imperial Beach. [Citations.]" The TAC further alleged: "Although State had the power to require changes to all three projects, it failed to exercise such power to protect the First Street shoreline."

State demurred to the TAC. Regarding the third, fourth, and fifth causes of action, State asserted the affirmative defense that Plaintiffs had failed to timely challenge CCC's concurrences with Navy and Army's consistency determinations by filing a petition for writ of administrative mandate within 60 days after CCC's decisions became final as required by Public Resources Code section 30801. The trial court sustained State's demurrer to the third, fourth, and fifth causes of action. The court stated:

> "Plaintiffs' claims against the State are premised on [CCC's] role in reviewing the dredging projects. [Citation.] The State argues [P]laintiffs failed to timely challenge [CCC's concurrences with the Navy and Army's] consistency determinations after [P]laintiffs[] participated in the hearing and asserted objections to [CCC's] findings. [Citations.] The Court agrees with the State's position, and

> finds these claims fail[] because [P]laintiffs failed to challenge [CCC's] actions within the applicable statute of limitations."

Accordingly, the court dismissed the third, fourth, and fifth causes of action against State.

C

*Consistency determinations generally*.  The Coastal Act is a comprehensive scheme to govern land use planning for California's coastal zone.  (*San Diego Navy Broadway Complex Coalition v. California Coastal Com.* (2019) 40 Cal.App.5th 563, 571.)  CCC has jurisdiction to review determinations by federal agencies that their projects are consistent with the Coastal Act.  (Pub. Resources Code, §§ 30000, 30321, 30330.)  Specifically, CCC "may . . . grant or issue any certificate or statement required pursuant to [the federal Coastal Zone Management Act of 1972 (16 U.S.C. § 1451, et seq.)] that an activity of any person, including any . . . federal agency, is in conformity with" the Coastal Act.  (Pub. Resources Code, § 30330.)

Under the federal Coastal Zone Management Act (CZMA), activities of federal agencies within the coastal zone that affect any land or water use or natural resource "shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs."  (16 U.S.C. § 1456(c)(1)(A); see also 16 U.S.C. § 1456(c)(2).[9])  When carrying out such an activity, a federal agency "shall provide a consistency determination to the relevant State agency

---

[9]     16 U.S.C. § 1456(c)(2) provides:  "Any Federal agency which shall undertake any development project in the coastal zone of a state shall insure that the project is, to the maximum extent practicable, consistent with the enforceable policies of approved state management programs."

[e.g., CCC] . . . at the earliest practicable time, but in no case later than 90 days before final approval of the Federal activity . . . ."  (16 U.S.C. § 1456(c)(1)(C); see also *City of Sausalito v. O'Neill* (9th Cir. 2004) 386 F.3d 1186, 1201 (*City of Sausalito*).)  An agency or other applicant applying for a federal permit for an activity that may affect a state's coastal zone "shall provide in the application to the licensing or permitting agency a certification that the proposed activity complies with the enforceable policies of the state's approved program and that such activity will be conducted in a manner consistent with the program.  At the same time, the applicant shall furnish to the state or its designated agency a copy of the certification . . . ."  (16 U.S.C. § 1456(c)(3)(A).)

"At the earliest practicable time, the state or its designated agency shall notify the Federal agency concerned that the state concurs with or objects to the applicant's certification."  (16 U.S.C. § 1456(c)(3)(A).)  By federal regulation, a state agency, such as CCC, has 60 days to concur with, conditionally concur with, or object to a federal agency's consistency determination.  (15 C.F.R. §§ 930.41 [60-day review period for concurrences or objections], 930.43, 930.4.)  If a state agency, such as CCC, objects to a consistency determination, it must state the reasons for its objection, describe how the proposed project is inconsistent with its coastal management program, and describe alternative measures.  (15 C.F.R. § 930.43(a)(3).)  However, if the state and federal agency cannot resolve their differences, the federal agency can nevertheless proceed with its proposed activity over the state's objection if it concludes its proposed activity is fully consistent with the enforceable policies of the state's coastal management program.

45

(15 C.F.R. § 930.43(d).)  If CCC believes the proposed federal activity violates and/or is otherwise inconsistent with the CZMA and/or the Coastal Act, CCC may file an action for injunctive relief enjoining the federal agency from proceeding with the proposed activity.  (See, e.g., *California Coastal Com.*, *supra*, 5 F.Supp.2d at pp. 1107-1109, 1112.)  Likewise, "parties other than those charged with making or concurring in a consistency determination" are allowed to bring suit under the CZMA.  (*City of Sausalito*, *supra*, 386 F.3d at p. 1201; see also, *Akiak Native Community v. United States Postal Serv.* (9th Cir. 2000) 213 F.3d 1140, 1144-1146 [reviewing claims brought by Alaska native communities]; *Northwest Envtl. Def. Ctr. v. Brennen* (9th Cir. 1992) 958 F.2d 930, 936-937 [reviewing claims brought by environmental groups].)

## D

*Plaintiffs' causes of action*.  One element of each of Plaintiffs' causes of action against State for inverse condemnation, nuisance, and removal of lateral support is that State performed, or omitted to perform, an act that resulted in damage to their properties. (See, e.g., *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 602 [inverse condemnation cause of action requires proof that public entity took or damaged plaintiff's property for public use]; CACI No. 2020 [public nuisance liability requires that government entity act, or fail to act, and thereby create nuisance condition]; *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28, 38 [public nuisance liability requires that government entity create, or assist in creation of, nuisance]; *Lee v. Takao Bldg. Development Co.* (1985) 175 Cal.App.3d 565, 568-569 [liability for damage to plaintiff's property caused by defendant's removal of lateral

46

support]; Civ. Code, § 832 [duty of lateral and subjacent support]; *Los Osos Valley Associates v. City of San Luis Obispo* (1994) 30 Cal.App.4th 1670, 1680 [government liability for damage caused by removal of subjacent support is under inverse condemnation theory].)

As discussed *ante*, the TAC alleged that State substantially participated in the Navy and Army's dredging projects that ultimately caused harm to Plaintiffs' properties. Specifically, the TAC alleged State substantially participated in all three dredging projects because it "had the power to require changes" to the dredging projects, as shown by: (1) State's objection to Navy's 1998 dredging project and the subsequent preliminary injunction it obtained halting the dredging project until Navy contributed $9.6 million toward erosion mitigation measures; or (2) State's withholding of its consent to Army's consistency determination for its 2004-2005 dredging project until Army agreed to dispose of dredged material off of Imperial Beach's shoreline. The TAC alleged that although State "had the power to require changes" to the three dredging projects, State failed to exercise its power to protect the First Street shoreline and Plaintiffs' properties.

Our review of the TAC and the legal principles regarding consistency determinations for federal projects, as discussed *ante*, shows the TAC's causes of action alleged against State for inverse condemnation, nuisance, and removal of lateral support are, in fact, based on State's decisions to concur with, or not to object to or otherwise challenge, the consistency determinations of Navy and Army regarding their federal dredging projects. Because the TAC does not allege that State was involved in the planning of those dredging projects or the actual dredging that allegedly caused the

47

damage to Plaintiffs' properties, the only wrongful acts or omissions that Plaintiffs allege against State are its concurrences, or failures to object or otherwise challenge Navy and Army's consistency determinations for their federal dredging projects. Therefore, if a cause of action against State cannot, as a matter of law, be stated based on those acts or omissions, State's demurrer must be sustained. (*City of Morgan Hill*, *supra*, 118 Cal.App.4th at p. 870.) In particular, if on the face of the complaint a statute of limitations defense bars the action, a general demurrer must be sustained. (*Mitchell*, *supra*, 1 Cal.App.5th at p. 1007; *Coalition for Clean Air*, *supra*, 209 Cal.App.4th at p. 419.)

E

*Statute of limitations defense*. In demurring to the TAC's third, fourth, and fifth causes of action for inverse condemnation, nuisance, and removal of lateral support, State asserted that the affirmative defense of a statute of limitations applied to bar those causes of action. In particular, State argued that because Plaintiffs did not file a Code of Civil Procedure section 1094.5 petition for writ of administrative mandate within 60 days of its final decisions concurring with the consistency determinations of Navy and Army, Plaintiffs are statutorily barred by Public Resources Code section 30801 from alleging causes of action against State based on its concurrences with those consistency determinations.

Public Resources Code section 30801 provides: "Any aggrieved person shall have a right to judicial review of any decision or action of [CCC] by filing a petition for a writ of mandate in accordance with Section 1094.5 of the Code of Civil Procedure, *within 60*

48

*days* after the decision or action has become final." (Italics added.) That statute defines an "aggrieved person" as "any person who . . . appeared at a public hearing of [CCC] . . . in connection with the decision or action appealed, or who . . . informed [CCC] . . . of the nature of his concerns or who for good cause was unable to do either." (Pub. Resources Code, § 30801.)

"Failure to file a petition for mandate, as required by [Public Resources Code section 30801], renders [CCC's] decision 'immune from collateral attack." (*Walter H. Leimert Co. v. California Coastal Com.* (1983) 149 Cal.App.3d 222, 233.) "[A]dministrative mandamus is the 'proper and sole remedy' for challenging or seeking review of" a CCC decision. (*Ibid*.) The failure to file a timely petition for writ of administrative mandate results, in effect, in a "waiver of any inverse condemnation and related claims." (*Ojavan Investors, Inc. v. California Coastal Com.* (1994) 26 Cal.App.4th 516, 524.) A plaintiff cannot decline to avail itself of the procedures of Code of Civil Procedure section 1094.5 and thereby "convert that right into a cause of action in inverse condemnation." (*Pfeiffer v. City of La Mesa* (1977) 69 Cal.App.3d 74, 78 (*Pfeiffer*).) Alternatively stated, "[c]ompliance with procedural writ requirements 'remains a necessary predicate to institution of inverse condemnation proceedings.' " (*Serra Canyon Co. v. California Coastal Com.* (2004) 120 Cal.App.4th 663, 669 (*Serra Canyon Co.*).) "Once [CCC's] . . . decision becomes final, the affected property owner is estopped from relitigating the validity of the decision in a subsequent inverse condemnation action." (*Id*. at p. 670.)

49

"Important policy concerns underlie [Public Resources Code section 30801's] requirement that inverse condemnation claims arising out of administrative actions, as well as other challenges to administrative actions, be raised initially by way of administrative mandamus. . . . [T]he [public] agency must be afforded an opportunity to change . . . the challenged action . . . . [¶] The requirement that challenges to administrative actions constituting takings be brought initially by administrative mandamus assures that the administrative agency will have the alternative of changing a decision for which compensation might be required." (*Patrick Media Group, Inc. v. California Coastal Com.* (1992) 9 Cal.App.4th 592, 611-612.) "An agency's interest in prompt notice of a challenge to its decisions is, after all, equally great, whether the party raising that challenge is a landowner, a permit applicant, or any other party." (*Id*. at p. 612.)

In the circumstances of this case, the TAC does not allege, nor can it be reasonably inferred from its allegations, that CCC physically invaded or damaged Plaintiffs' properties. (Cf. *Pacific Shores Property Owners Assn. v. Department of Fish & Wildlife* (2016) 244 Cal.App.4th 12, 34 (*Pacific Shores Property Owners Assn.*).) Rather, the only conduct by State alleged to have caused the damage to Plaintiffs' properties in their third, fourth, and fifth causes of action is CCC's concurrences with, or failures to object to or otherwise challenge, Navy and Army's consistency determinations for their federal dredging projects. Because the record on appeal does not show, and Plaintiffs do not assert, that they filed a petition for writ of administrative mandate within 60 days of CCC's decisions to concur with, and not object to and otherwise challenge,

50

those consistency determinations, the 60-day statute of limitations under Public Resources Code section 30801 applies to bar Plaintiffs' causes of action for inverse condemnation, nuisance, and removal of lateral support.[10] (Cf. *Pacific Shores Property Owners Assn.*, at p. 34.) Accordingly, the trial court did not err by sustaining State's demurrer to the TAC's third, fourth, and fifth causes of action.

To the extent Plaintiffs argue that their causes of action against State are not based on CCC's decisions to concur with, or not object to or challenge, Navy and Army's consistency determinations, but are instead based on the physical damage to their properties subsequently caused by the federal dredging projects, we disagree. As we concluded *ante*, the TAC does not allege, nor can it be reasonably inferred from its allegations, that CCC physically invaded or damaged Plaintiffs' properties.[11] (Cf. *Pacific Shores Property Owners Assn.*, *supra*, 244 Cal.App.4th at p. 34.) Plaintiffs cannot decline to avail themselves of the procedures of Code of Civil Procedure section 1094.5 and thereby "convert that right into a cause of action in inverse condemnation." (*Pfeiffer*, *supra*, 69 Cal.App.3d at p. 78; see also *Serra Canyon Co.*, *supra*, 120

---

[10] In fact, there is nothing in the record on appeal showing that Plaintiffs have, to date, *ever* filed a petition for writ of administrative mandate challenging CCC's decisions to concur with, or not object to or challenge, Navy and Army's consistency determinations regarding the federal dredging projects in 1998, 2002, and 2004 to 2005.

[11] We likewise reject Plaintiffs' assertion that their three causes of action are based on State's alleged exercise of dominion and control over their properties. Rather, that allegation relates only to their quiet title causes of action which, as discussed *ante*, are barred by res judicata. We are not persuaded by Plaintiffs' conclusory arguments to the contrary.

Cal.App.4th at p. 669.)  Therefore, Plaintiffs do not show that the 60-day statute of limitations under Public Resources Code section 30801 does not bar their causes of action for inverse condemnation, nuisance, and removal of lateral support.[12]

Furthermore, to the extent Plaintiffs argue the trial court's order sustaining State's demurrer to the three causes of action is inconsistent with our opinion in *SLPR I* in which we concluded there were triable issues of material fact regarding those causes of action, we conclude that there is no language in our *SLPR I* opinion addressing the Public Resources Code section 30801 statute of limitations or precluding State from raising that statute of limitations defense on remand in a demurrer to the TAC.  To the extent we concluded there was evidence to support a finding that State substantially participated in the dredging projects, that evidence specifically consisted of CCC's concurrence with, or failure to object to, the consistency determinations of Navy and Army regarding those dredging projects and not because of any direct involvement in those dredging projects. A statute of limitations defense may be raised in a demurrer or answer and thereby avoid forfeiture of that defense.  (*Samuels v. Mix* (1999) 22 Cal.4th 1, 5, 8; *County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 912 ["The time bar of a statute of limitations may be raised by demurrer '[w]here the complaint discloses

_____

[12]    In concluding that Plaintiffs' three causes of action are barred by the 60-day statute of limitations, we need not, and do not, rely on the three exhibits that Plaintiffs argue the trial court erroneously granted judicial notice of, and relied on, in sustaining State's demurrer.  Those exhibits relate to a 2009 federal district court order in Plaintiffs' federal action, which order required Army to issue a new consistency determination, and subsequent CCC correspondence related thereto.

on its face that the statute of limitations has run on the causes of action stated in the complaint, [for the reason that] it fails to state facts sufficient to constitute a cause of action. [Citation.]' "]; *Everts v. Blaschko* (1936) 17 Cal.App.2d 188, 190.) By raising the affirmative defense of Public Resources Code section 30801 in its demurrer to the TAC, State timely raised that defense.[13]

Finally, we note that Plaintiffs do not argue on appeal that they can amend their complaint to avoid the application of the Public Resources Code section 30801 statute of limitations. In particular, they do not show there is a reasonable possibility that the TAC can be amended to avoid the application of that statute of limitations. Therefore, the trial court did not abuse its discretion by denying Plaintiffs an opportunity to amend the TAC while sustaining State's demurrer. (*Traders Sports*, *supra*, 93 Cal.App.4th at p. 43; *Friedland*, *supra*, 62 Cal.App.4th at pp. 841-842.)

---

[13] In any event, had State not timely raised that statute of limitations defense, we conclude the trial court would not have abused its discretion if it had allowed State to amend its pleadings to add that defense. (See, e.g., *Trower v. City and County of San Francisco* (1910) 157 Cal. 762, 768-769; *Copp v. Millen* (1938) 11 Cal.2d 122, 131; cf. *Estate of Horman* (1971) 5 Cal.3d 62, 73.)

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:


HALLER, J.


DATO, J.